**UNITED STATES of America, Appellee,**

v.

**Derrick Lance BLACKMAN, Appellant.**

**No. 88–2771.**

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 14, 1989.

Decided Jan. 5, 1990.

F. Lee Bailey, Boston, Mass., for appellant.

Linda L. Parker, Kansas City, Mo., for appellee.

Before McMILLIAN and FAGG, Circuit Judges, and HEANEY, Senior Circuit Judge.

McMILLIAN, Circuit Judge.

Derrick Lance Blackman appeals from a final judgment entered in the District Court[1] for the Western District of Missouri upon a jury verdict finding him guilty of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) (Count I) and money laundering in violation of 18 U.S.C. § 1956 (Counts II–VI). The district court sentenced Blackman to 25 years under Count I and 5 years

1. The Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri.

each for Counts II–VI, to be served concurrently. On appeal, Blackman argues that: (1) the district court erroneously denied his motion to suppress evidence obtained from a search of his luggage and incriminating statements made to arresting officers, (2) the government's evidence on the money laundering charges is insufficient to sustain a guilty verdict, (3) the jury instructions on the money laundering counts were inadequate, (4) the district court erroneously admitted into evidence Blackman's pistol and certain hearsay statements, (5) his sentence under the Sentencing Guidelines violates his constitutional right to due process, and (6) he was denied effective assistance of counsel. We affirm the conviction, but remand the case for resentencing consistent with Part IV of this opinion.

Between May 10 and 12, 1988, the Kansas City Police Department and the FBI received several phone calls from an anonymous informant purporting to have inside information on the drug activity of Derrick Lance Blackman also known as Darnell Draper, Thomas McElroy, and Donald Summers. The informant told police that Blackman would be arriving in Kansas City within the next few days on an Amtrak train from Los Angeles with large amounts of cocaine. The informant thought that Blackman would be transporting the cocaine in wheel rim boxes. The informant described Blackman as a 25-year-old black male with a large build, wanted in several states, possibly dangerous, and residing in the area of 38th & Warwick Streets in Kansas City. The informant also told police that Blackman owned a black, dual rear-wheel truck located at Clay's Corvettes on 63rd Street in Kansas City and that Blackman owned a wheel rim shop across from an Amtrak station in Torrence, California.

Police verified some of the information about Blackman supplied by the informant. A black, dual rear-wheel pickup truck was parked near Clay's Corvettes, with Missouri registration in the name of Donald Summers, one of Blackman's aliases. Po-

lice confirmed the existence of a wheel rim shop across from the Amtrak station in Torrence, California. They also learned from the Los Angeles Police Department that Blackman a/k/a Darnell Draper had been involved in a homicide in the Los Angeles area, but he was not at that time wanted there for any crime.

Police conducted surveillance of the Kansas City Amtrak station on the mornings of May 12 and 13, 1988, looking for a black male who matched a photograph of Derrick Blackman they had obtained from the Los Angeles Police Department. On May 13, a police officer observed a man whom he suspected to be Blackman depart a train arriving from Los Angeles carrying two bags and a small toiletry bag. The police observed the suspect approach a taxi driver he appeared to know, make a phone call, put his luggage in the trunk of the taxi, and drive away in the back seat of the taxi.

Police Officer Pelter followed the taxi in an unmarked police vehicle, and got close enough to the taxi to compare the passenger to the photograph of Blackman. He then ordered a marked police vehicle to stop the taxi. Officer Pelter approached the passenger side of the taxi and began questioning Blackman about where he was going and whether he had any luggage. Blackman told Pelter he was going to his girlfriend's house but would not divulge the address. He denied having any luggage. Blackman produced a California driver's license in the name of Donald Summers. After radioing his sergeant, Officer Pelter placed Blackman under arrest and asked to search his luggage. Blackman refused to consent to a search and told Pelter he would have to get a warrant.

More officers arrived on the scene, and the taxi driver eventually opened the trunk of the taxi.[2] As Sergeant Pierce transferred Blackman's three bags to a police car pending issuance of a warrant to search their interior, she felt brick-shaped objects inside Blackman's red bag which resembled

---

**2.** One of the grounds upon which the government justifies the search is consent. Because we find the search valid on other grounds, we have not given factual detail surrounding the eventual consent given by the driver of the taxi to search the trunk.

boxes she had seen used to transport kilograms of cocaine. All this information was included in the search warrant affidavit. The warrant was issued and executed. In Blackman's red bag, police found three kilograms of cocaine powder, over 800 grams of crack cocaine, a nation-wide pager system, and a battery pack for a cellular mobile telephone. In the other bag police recovered six more kilograms of cocaine powder.

In addition to the evidence found in Blackman's luggage, the government introduced evidence seized from a valid search of Blackman's apartment in Kansas City and testimony from various narcotics experts. In Blackman's apartment, police found a .22 caliber pistol, a pager system, more cocaine, a "drug ledger," and a wheel rim box. A narcotics expert testified that the cocaine found on Blackman was worth from 1 to 3 million dollars and that only an upper-level dealer would be carrying that amount of cocaine.

In addition to charges of possession with intent to distribute cocaine (Count I), Blackman was charged with five counts of money laundering in violation of 18 U.S.C. § 1956. At trial the government introduced the following evidence in support of those charges. On four separate occasions, Blackman, using the names Darnell Draper and Thomas McElroy, wired money via Western Union to a woman in Inglewood, California, a suburb of Los Angeles (Counts III–VI). The four wires, sent over a four-month period, totalled $11,000. A narcotics expert told the jury that drug traffickers commonly use Western Union to transfer cash needed in their business. The fifth charge (Count II) involved an arrangement between Blackman and Citadel Auto Sales to transfer title in Blackman's truck from Thomas McElroy to Donald Summers. Blackman approached Citadel Auto Sales and paid them some $4,000 in exchange for papers purporting to sell the truck to Donald Summers with a lien

attached. A narcotics expert testified that drug traffickers favor liens because it shields the motor vehicle from seizure should the trafficker be arrested or stopped.

## I. Motion to Suppress

Before trial, Blackman moved to suppress evidence obtained from the search of his luggage and the two statements about his luggage he made to police at the time of his arrest. Blackman's motion was denied. He appeals on the grounds that the search violated his fourth amendment right to be free from unreasonable searches and that the statements were made before he was advised of his *Miranda* rights.

### A.

We first address the validity of the search of Blackman's luggage. Blackman essentially challenges the validity of three separate searches. He argues: (1) the police did not have probable cause to search the trunk of the taxi without a warrant; (2) Sergeant Pierce's touching of the bags constitutes a warrantless search which does not fit into any recognized exception to the warrant requirement; and (3) the search warrant affidavit included false statements and material omissions which render the warrant invalid. For the reasons discussed below, we reject all three of Blackman's arguments.

 The search of the trunk and the seizure of the luggage contained therein pending issuance of a search warrant are justified under the automobile exception to the warrant requirement.[3] *See Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). While the police could not have justified a search of the *interior* of the bags found in the trunk under the automobile exception to the warrant requirement, *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), seizure of the luggage from the trunk was

---

**3.** Contrary to the government's assertion, the search of the trunk cannot be justified as a lawful search incident to arrest. *See New York v. Belton*, 453 U.S. 454, 462, 101 S.Ct. 2860, 2865, 69 L.Ed.2d 768 (1981). Because the trunk was

not within the reach of the detainee, it poses no threat to an arresting officer and therefore is outside the scope of a search incident to arrest. *See Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

lawful. In *Arkansas v. Sanders*, a case involving nearly identical facts, the Supreme Court noted, "[h]aving probable cause to believe that contraband was being driven away in the taxi, the police were justified in stopping the vehicle, searching it on the spot, and seizing the suitcase they suspected contained contraband." 442 U.S. at 761, 99 S.Ct. at 2591 (citing *Chambers v. Maroney*, 399 U.S. at 52, 90 S.Ct. at 1981). *See also United States v. Chadwick*, 433 U.S. 1, 13 n. 8, 14, 97 S.Ct. 2476, 2485 n. 8, 2485, 53 L.Ed.2d 538 (1977) (seizure of a footlocker thought to contain contraband from the trunk of an automobile not challenged on appeal but the Supreme Court noted that the search of the interior of the footlocker was a far greater intrusion into fourth amendment values than its impoundment). Under the totality of the circumstances, we find that the police had probable cause to believe the trunk of the taxi contained evidence of illegal drug trafficking.[4] Blackman argues that probable cause did not exist because the police were looking for a man transporting cocaine in wheel rim boxes and his bags were not large enough to contain a wheel rim box. This discrepancy did not significantly detract from the police's knowledge about Blackman's criminal activity.[5] Virtually every other fact supplied by the informant had been corroborated by the time police first observed Blackman, including his arrival in Kansas City on an Amtrak train from Los Angeles. As the Supreme Court noted in *Gates*, "[i]t is enough, for purposes of assessing probable cause, that

'corroboration through strict sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.'" 462 U.S. at 244–45, 103 S.Ct. at 2335 (quoting *Jones v. United States*, 362 U.S. 257, 269, 271, 80 S.Ct. 725, 735, 736, 4 L.Ed.2d 697 (1960)).

We need not address the validity of Sergeant Pierce's handling of Blackman's luggage because the affidavit contains sufficient information to support a finding of probable cause to search the interior of the bags without the two sentences devoted to the brick-like objects she felt inside the red bag. Therefore, we decline to address whether Sergeant Pierce's conduct constitutes a search, or whether we would apply a "plain touch" exception in this case. *See United States v. Williams*, 822 F.2d 1174 (D.C.Cir.1987) (plain view exception encompasses "plain touch").

■ Nor do we find that any omissions or misleading statements contained in the affidavit invalidate the warrant. The affidavit stated that Sergeant Pierce felt "several" brick-sized objects in Blackman's red bag. At the suppression hearing, Sergeant Pierce testified that she could not be sure she felt more than one object in the bag. Although her statement may have misled the magistrate, it is immaterial to his finding of probable cause. Blackman also argues that if the magistrate had been told that police were looking for a man transporting cocaine in wheel rim boxes he would not have issued the warrant. We

---

**4.** Blackman argues that the totality of the circumstances test in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) does not apply to warrantless searches. Instead he urges us to apply the more stringent two-prong *Aguilar/Spinelli* test. *See Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1983) and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). While it is true that the *Gates* test measured probable cause to obtain a warrant, we find that it is equally applicable to measure probable cause when no warrant is needed. We are not persuaded by Blackman's argument that the rationale behind the totality of the circumstances test in *Gates* is unique to the issuance of warrants. As the Supreme Court noted in *United States v. Ross*, 456 U.S. 798, 808, 102 S.Ct. 2157, 2164, 72

L.Ed.2d 572 (1982), a case deciding the scope of the automobile exception, "... the probable-cause determination must be based on objective facts that could justify the issuance of a warrant by a magistrate...."

**5.** Furthermore, even if the police only had reasonable suspicion to justify an investigatory stop, those suspicions clearly rose to probable cause when Blackman confirmed his identification and denied having any luggage. *See United States v. Eisenberg*, 807 F.2d 1446, 1450 (8th Cir.1986) (police may stop a moving vehicle to investigate a reasonable suspicion that the occupant is engaged in criminal activity). *See also Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980).

disagree. As the district court found, the magistrate's decision to issue the warrant would not have been affected had he known about the wheel rim boxes. This finding is not clearly erroneous. *See United States v. Flett*, 806 F.2d 823, 826 (8th Cir.1986) (district court's findings of fact on motion to suppress reviewable under clearly erroneous standard).

We therefore uphold the validity of the search of Blackman's luggage and the admission of evidence obtained as a result of that search.

### B.

■ We next address the denial of Blackman's oral motion to suppress two incriminating statements he made to arresting officers before he was advised of his *Miranda* rights. Blackman argues that his denial of having luggage and his refusal to consent to a search were statements elicited during custodial interrogation without the benefits of *Miranda* warnings, and therefore should have been suppressed. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Although we tend to agree with Blackman that the district court erred in refusing to suppress the statements, we hold that the error was harmless in light of the overwhelming evidence submitted against Blackman on the cocaine charge.[6]

■ Contrary to the government's assertion, we are not limited to the plain error standard on this matter. *See* Government's Brief at 27. The government argues that because defense counsel failed to make a timely objection to the admission of Blackman's statements, we can only reverse if the admission of the two statements amounts to plain error. A closer examination of the record would have reminded the government that, at the outset of trial, defense counsel asked for, and was granted, a continuing objection to all evidence he sought to suppress in his pretrial motion. Transcript of Proceedings, Vol. III, 551–52. This, as the district court noted, preserves the issue for appeal. *Id.* at 552.

A review of the entire record, exclusive of any reference to the two incriminating statements, convinces us beyond a reasonable doubt that their erroneous admission was harmless. *See Jones v. Wyrick*, 542 F.2d 1013, 1014 (8th Cir.1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1603, 51 L.Ed.2d 807 (1977). *See also Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The evidence against Blackman relevant to his intent to distribute cocaine, the element to which the statements are relevant, is overwhelming. Blackman was found in possession of over nine kilograms of cocaine powder and over 800 grams of crack cocaine. At the time of his arrest, Blackman was carrying some $2,000 in cash. Blackman's apartment contained devices commonly used in the drug trade: four wheel rim boxes; baking soda; a .22 caliber pistol; and a "drug ledger." Blackman testified in his defense that he did not know the cocaine was in his luggage. He testified that he was transporting the blue bag as a favor for a friend. As to the cocaine in the red bag, Blackman's testimony only inferred that his friend had placed it there without his knowledge. In light of all the evidence, we hold that the admission of Blackman's statements to the officers concerning his luggage was harmless error.

### II. Money Laundering

Blackman appeals the district court's denial of his motion for acquittal on the five money laundering counts, and challenges for the first time on appeal the adequacy of the jury instructions on those counts. Blackman argues that the government

---

**6.** Blackman's detention was far from routine. *Contra Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (questions posed to a motorist after a routine traffic stop do not constitute custodial interrogation). Instead Blackman was the center of an investigation. *See United States v. Terry Gene Carter,* 884 F.2d 368 (8th Cir.1989). A reasonable person in Blackman's shoes would not have felt free to leave the scene, and numerous officers were present at the time of questioning to arrest Blackman for transporting drugs the police firmly believed to be in the trunk of the taxi.

failed to produce evidence from which a juror could find beyond a reasonable doubt that the financial transactions underlying the charges involved proceeds from drug trafficking. Blackman also argues that the instructions failed to adequately inform the jury of the government's burden on this element. We reject both arguments.

When considering a challenge to the sufficiency of the evidence to convict, we view the evidence in a light most favorable to the government. *United States v. O'Connell,* 841 F.2d 1408, 1424 (8th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989). If a juror could reasonably infer from the evidence presented at trial that Blackman had engaged in money laundering proscribed by 18 U.S.C. § 1956, we must uphold the conviction.

We turn first to the legal issues Blackman raises about the scope of 18 U.S.C. § 1956. The government charged Blackman under 18 U.S.C. § 1956(a)(1)(A) and 18 U.S.C. § 1956(a)(1)(B)(i). According to these provisions, the government has the burden of proving beyond a reasonable doubt that Blackman knowingly conducted a financial transaction which involved the proceeds of drug distribution and that he did so either with the intent to promote his drug business or with knowledge that the transaction was designed to disguise the nature or source of those proceeds. Blackman argues that (1) the transfer of title on his pickup truck does not constitute a financial transaction under the statute; [7] (2) the government must trace the proceeds involved in the transactions to a particular drug sale; and (3) the government cannot satisfy its burden of proof on the proceeds element by merely showing that a drug trafficker has no other legitimate source of income.

Turning first to the element of a "financial transaction," we are convinced that Blackman's arrangement with Citadel Auto Sales constitutes a financial transaction within the scope of 18 U.S.C. § 1956. The statute defines "financial transaction" very broadly. *See* S.Rep. No. 433, 99th Cong.2d Sess. 12–13 (1986). The term includes the purchase, sale or disposition of any kind of property as long as the disposition involves a monetary instrument. For example, a deposit of money in a bank and the subsequent use of that money to purchase a house are two transactions within the scope of the statute. *Id.* In this case the transaction between Blackman and Citadel Auto Sales purported to be a sale of the truck from Citadel to Donald Summers. The government submitted evidence that Blackman paid Citadel to conduct the transaction. Accordingly, we find that the transaction in question fits squarely within the coverage of § 1956, and is precisely the type of transaction that Congress intended to criminalize.

Unfortunately neither the statute nor its legislative history precisely addresses the requirement that the money involved in the transaction represent proceeds from drug trafficking.[8] The government relied on evidence of Blackman's involvement in drug trafficking and his lack of any legitimate source of income to raise the inference that the money wired to Los Angeles and paid to Citadel Auto Sales represented proceeds from drug distribution. While the government can point to no specific drug sale that produced the money,[9] we do not believe that the government's evidence fails to make out a claim of money laundering under 18 U.S.C. § 1956. We do not read the statute to require that the government trace the pro-

---

**7.** There is no question that the four wire transfers in Counts III–VI are "financial transactions," which by definition includes the movement of funds by wire. 18 U.S.C. § 1956(c)(4).

**8.** It is on this element that Blackman also challenges the adequacy of the jury instructions. We review the merits of Blackman's challenge to the jury instructions under the plain error standard because he failed to object at trial. *United States v. Young,* 702 F.2d 133, 136 (8th

Cir.1983). Under this standard, and because of our holding on the sufficiency of the government's evidence on the proceeds elements, we find Blackman's challenge to the jury instructions without merit.

**9.** Each transaction occurred well before Blackman was found with the cocaine constituting the violation of 21 U.S.C. § 841 in Count I.

ceeds to a *particular* sale. We do agree with Blackman that the government cannot rely *exclusively* on proof that a defendant charged with using proceeds from an unlawful activity has no legitimate source of income. However, as the Third Circuit noted in *United States v. Massac*, 867 F.2d 174 (3rd Cir.1989), evidence of a defendant's use of wire service to transfer cash to Haiti rather than a bank, combined with evidence of defendant's drug trafficking, is sufficient to sustain a conviction of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i).

■■■ We must remember that the government's burden on a particular element of the offense may be satisfied by circumstantial evidence as long as it is sufficient to prove that element beyond a reasonable doubt. In *United States v. Matra*, 841 F.2d 837, 841 (8th Cir.1988), for example, we noted that large sums of unexplained currency is circumstantial evidence of intent to distribute cocaine. Reviewing the entire record, we conclude that the government presented sufficient circumstantial evidence from which a juror could infer each element of the money laundering offense beyond a reasonable doubt. The government introduced undisputed evidence of Blackman's use of Western Union to transfer $11,000 to Los Angeles. The jury heard testimony from an expert witness explaining drug dealers' common use of the wire services in furtherance of their drug activities. The jury also heard from an expert who testified that drug dealers prefer to drive automobiles which are encumbered by a lien so as to protect the automobile from police seizure. According-

ly, we hold that the district court did not err in denying Blackman's motion for acquittal on the money laundering counts.

### III. Admissibility of Pistol and Certain Hearsay Statements

Blackman challenges the admissibility of a pistol seized from his apartment and certain hearsay statements elicited from two witnesses on the government's re-direct examination. Neither challenge warrants reversal of Blackman's conviction.

■■■ Contrary to Blackman's assertion, presence of a firearm is relevant to the element of Blackman's intent to distribute cocaine. *See United States v. Brett*, 872 F.2d 1365, 1370 (8th Cir.) (citing *United States v. LaGuardia*, 774 F.2d 317, 320 (8th Cir.1985)), *cert. denied*, —— U.S. ——, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989). Nor do we find that the district court abused its discretion by finding that the pistol's relevance outweighed its possible prejudice. Therefore, we hold that the district court did not err in admitting the pistol into evidence.

■■■ Because defense counsel failed to object to the admission of the hearsay statements, we review their admission under the plain error standard. *United States v. Miller*, 725 F.2d 462, 467 (8th Cir.1984). The admission of hearsay statements elicited from two government witnesses on re-direct was not plain error. In each instance, defense counsel opened the door by questioning the witness about the nature of the transaction between Blackman and Citadel Auto Sales.[10] On re-di-

---

10. On cross-examination defense counsel asked Sergeant Bass:
> Q: Okay. Did your investigation reveal that this is a sham document?
> A: Yes sir.
> On re-direct, the following occurred:
> Q: I believe you indicated that your investigation, in response to a question by defense counsel, that the investigation revealed this was a sham transaction?
> A: That is our belief, yes ma'am.
> Q: In fact was that stated by Mr. Wright?
> A: Yes, ma'am.
> (Transcript of Proceedings, Vol. II, 225, 226–27). Later defense counsel asked Special Agent Wissel:

> Q: Okay. Did you talk to a police officer by the name of Bass during your investigation?
> A: Yes. I had spoken with Sergeant Bass.
> Q: Did you learn that, at least it was his opinion that the transfer was a sham?
> A: On the Silverado truck, yes it was.
> On re-direct, the government asked:
> Q: When the question was asked whether you understood Sgt. Bass to have an opinion that this was a sham transaction, you said yes. Do you, yourself, have an opinion?
> A: Yes, I do. Don Wright told me it was a sham transaction.
> Q: And did Don Wright indicate to you whether he received any money for this?

rect, the government was merely trying to establish the foundation for each witness' opinion. We have often held admissible evidence which is adduced on re-direct to clarify an issue raised on cross-examination even if it would otherwise be inadmissible. *See, e.g., United States v. Womochil,* 778 F.2d 1311, 1315 (8th Cir.1985). Furthermore, even if they were erroneously admitted, the statements did not seriously affect Blackman's substantial rights. Cross-examination had already revealed that each witness thought the transaction to be a "sham." The government's re-direct did not significantly bolster that testimony.

### IV. Sentencing

Blackman was sentenced pursuant to the Sentencing Reform Act and the Guidelines promulgated under that Act. The district court enhanced Blackman's base offense level from 36 to 38 for obstruction of justice under Section 3C1.1 of the Guidelines because Blackman had used an alias during his detention hearing and prebail interview. On appeal, Blackman challenges the constitutionality of the Guidelines, on their face and as applied to him, under the due process clause of the fifth amendment. Blackman argues that the Guidelines deprive judges of discretion in sentencing, thereby depriving defendants of their right to have a court weigh the aggravating and mitigating factors affecting their sentence. Blackman also argues that he was unconstitutionally deprived of an evidentiary hearing on the elements of obstruction of justice under Guidelines Section 3C1.1 and asserts that evidence would show that his use of an alias did not constitute a material falsehood.[11]

A: Yes, he did. He received approximately $4,200.00
(Transcript of Proceedings, Vol. III, 331–32, 335–36).

**11.** § 3C1.1. *Willfully Obstructing or Impeding Proceedings*
If the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense, increase the offense level from Chapter Two by 2 levels.
*Application Notes:*

■ We turn first to Blackman's due process arguments. The Sentencing Guidelines do not *per se* violate a criminal defendant's right to due process under the fifth amendment. We have consistently upheld the Guidelines against allegations that they unconstitutionally eliminate a sentencing judge's discretion, and do so again in this case. *See United States v. Fuller,* 887 F.2d 144 (8th Cir.1989); *United States v. Williams,* 879 F.2d 454 (8th Cir.1989); *United States v. Brittman,* 872 F.2d 827 (8th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 184, 107 L.Ed.2d 140 (1989).

■ We turn now to the two-level enhancement for Blackman's use of an alias. The district court, relying on the Presentence Report, based the two-level enhancement for obstruction of justice on Blackman's use of an alias during a detention hearing and a prebail interview. The record shows that the police officers knew from the moment they were first tipped off to Blackman's criminal activity that Blackman used several aliases, and they also knew each name Blackman used. Far from impeding the investigation, Blackman's use of an alias when the police first approached him actually confirmed the police's suspicions that he was the suspect. We hold, consistently with our opinion in *United States v. Brett,* 872 F.2d 1365 (8th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989), that in order to increase a defendant's sentence under Section 3C1.1 for the defendant's use of an alias, the sentencing judge must make a factual determination that the use of an alias was a *material* falsehood. In *Brett,*

1. The following conduct while not exclusive, may provide a basis for applying this adjustment:
(a) destroying or concealing material evidence, or attempting to do;

. . . . .

(c) testifying untruthfully or suborning untruthful testimony concerning a material fact,
. . .

. . . . .

(e) furnishing *material falsehoods* to a probation officer in the course of a presentence or other investigation for the court.
(emphasis added).

we upheld an upward adjustment for use of an alias during an investigation because the district court specifically found that it cost the government "time, manpower and money." 872 F.2d at 1372–73. Because Blackman's use of an alias did not have a material bearing on the government's investigative efforts, we reverse the district court's decision to grant a 2-level enhancement for obstruction of justice and order that Blackman be resentenced according to a base offense level of 36.

## V.

■ Finally, Blackman argues he was deprived of his constitutional right to effective counsel. However, because the issue was not raised below, we have no record upon which to review Blackman's claims. We therefore decline to address the issue on this appeal. *See United States v. Gallegos–Torres*, 841 F.2d 240, 242–43 (8th Cir. 1988); *United States v. Dubray*, 727 F.2d 771, 772 (8th Cir.1984) (per curiam). The proper procedure for challenging the effectiveness of trial counsel is in a petition for post-conviction relief pursuant to 28 U.S.C. § 2255.

*Conclusion*

For the reasons above, we affirm Blackman's conviction on all charges. We do, however, find that the district court erred in failing to consider whether Blackman's use of an alias constitutes a material falsehood which qualifies him for an enhanced sentence under Section 3C1.1 of the Sentencing Guidelines. We accordingly remand the case to the district court for resentencing consistent with this opinion.