980 F.2d 728
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES OF AMERICA, Plaintiff-Appellee,
v.
Marvin THOMAS, a/k/a Marvin Haskins, Defendant-Appellant.
 No. 92-5021.
 United States Court of Appeals,
Fourth Circuit.
 Argued: October 30, 1992
Decided: December 2, 1992
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. Frederic N. Smalkin, District Judge. (CR-91-198-S)
 William Henry Porter, Jr., Baltimore, Maryland, for Appellant.
 John Francis Purcell, Jr., Assistant United States Attorney, Baltimore, Maryland, for Appellee.
 Richard D. Bennett, United States Attorney, Baltimore, Maryland, for Appellee.
 D.Md.
 AFFIRMED.
 Before MURNAGHAN and HAMILTON, Circuit Judges, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 PER CURIAM:
 
 
 1
 Appellant Marvin Thomas was convicted of numerous offenses arising from a drug conspiracy. On appeal, Thomas raises a litany of issues pertaining to the district court's evidentiary rulings, all of which we find are without merit. We, therefore, affirm.
 
 
 2
 * This case involves a conspiracy to distribute cocaine base (crack) in Prince George's County, Maryland. The major players in the conspiracy were Thomas, Thomas' mother, Eloise Haskins, and Thomas' cousin, Rudolph Chase. The evidence introduced at trial included numerous controlled purchases and intercepted conversations. Because this appeal only concerns Thomas, we recount the facts as they pertain to him.
 
 
 3
 Prior to his arrest in the summer of 1991, Richard Khanna sold pipe bombs to Thomas. Thomas wanted these pipe bombs for the purpose of suppressing rival competition in the drug business. After his arrest, Khanna agreed to assist the Prince George's County Police Department, the Bureau of Alcohol, Tobacco and Firearms (ATF), and the Drug Enforcement Administration, in its investigation of Thomas. Khanna agreed to have his conversations with Thomas and other members of an alleged drug organization monitored.
 
 
 4
 On October 4, 1990, Khanna met with Thomas. Thomas told Khanna that he was satisfied with the previous pipe bombs supplied to him, but wanted more powerful pipe bombs to deal with people who were giving him trouble.
 
 
 5
 The following day, Khanna met with Haskins. At this meeting, Khanna asked Haskins if she could supply him with an eighth of an ounce of crack. Haskins responded that Thomas would return with some crack later, after which she could provide him the amount he desired. Later that day, Haskins sold Khanna an eighth of an ounce of crack for $200.
 
 
 6
 On October 11, 1990, Haskins sold Khanna .42 grams of crack. The following day, Khanna purchased .2 grams of crack from Haskins at Haskins' residence located at 1807 Bellehaven Drive, Landover, Maryland. On October 15, 1990, Khanna introduced an undercover Special Agent of the ATF, Michael Bouchard, to Haskins, Thomas, Agnes Chase and Rudolph Chase. Later that day, Bouchard and Khanna went to the home of Rudolph and Agnes Chase and retrieved from Thomas two pipe bombs which Thomas had previously purchased from Khanna. Khanna tendered Thomas $100 after convincing him that the pipe bombs were defective.
 
 
 7
 On October 24, 1990, Khanna and Bouchard met with Haskins at Haskins' residence. During this meeting, Haskins told Bouchard about prior sales of drugs in which she and Thomas were involved, named sources of supply, and described methods of making money from the sale of drugs. Haskins also told Khanna and Bouchard that Thomas was returning with some crack and that she could supply them with an eighth of a kilogram of crack for $4,800.
 
 
 8
 Two days later on October 26, 1990, Haskins told Khanna that Thomas had just taken his ".357" to "take care" of some people that had "shot up" Haskins' house, almost killing her son "Tookie." After this, Khanna's assistance to the government ceased because he was incarcerated on state assault charges. However, Bouchard continued to meet with Haskins and Thomas, and on November 2, 1990, Bouchard purchased an eighth of a kilogram of crack from Thomas for $4,800.[1]
 
 
 9
 On November 9, 1990, Bouchard went to Haskins' residence in order to consummate an eighth of a kilogram of crack transaction with Thomas that was arranged the previous day. While awaiting Thomas' arrival, Bouchard spoke with Haskins. Haskins described prior drug sales of which she and Thomas were involved. She also described how profitable the drug business was and detailed how Thomas had purchased a Mercedes-Benz with some of the proceeds from the sale of drugs. Haskins also told Bouchard that she and Thomas kept money in safe deposit boxes.
 
 
 10
 After he arrived, Thomas called various sources of supply in order to obtain the eighth of a kilogram of crack for Bouchard, but was unsuccessful. Later that day, Thomas called Bouchard and informed him that he had an eighth of a kilogram of crack to sell Bouchard, but Bouchard told Thomas he was unable to complete the deal.
 
 
 11
 On November 14, 1990, Bouchard purchased 62.7 grams of crack from Thomas for $4,500 and discussed the sale of a quarter kilogram of crack for $7,000. On January 24, 1991, Bouchard purchased fiftytwo grams of crack from Rudolph Chase and Donnell Parker.[2]
 
 
 12
 After this sale, Bouchard had numerous conversations with Thomas and Haskins concerning future sales of crack. These conversations continued intermittently until February 5, 1991. The sales discussed never came to fruition. Thomas was subsequently arrested on February 6, 1991, and charged with violations of the controlled dangerous substance laws of the State of Maryland.
 
 
 13
 On the date of Thomas' arrest, search warrants were executed at the home of Haskins and the home of Thomas. The search of Haskins' residence led to the discovery of a pistol grip twelve-gauge shotgun, a pager, a safe deposit box rental receipt in the name of Haskins and Thomas, and an envelope addressed to Thomas at Haskins' residence. The return address of the envelope indicated that Thomas was unemployed. The search of Thomas' residence led to the discovery of two handguns: a loaded .357 magnum and a ninemillimeter pistol.
 
 
 14
 On May 30, 1991, a federal grand jury sitting in the District of Maryland returned a ten-count indictment charging Thomas, Haskins, Rudolph Chase, Agnes Chase, Parker, and Reggie Lnu, with conspiracy to possess with intent to distribute and distribute in excess of fifty grams of crack in violation of 21 U.S.C. §§ 841(a)(1) and 846 (count one), and numerous other offenses arising from the drug conspiracy.[3] Thomas was charged in count three with possession of two unregistered firearms (the two pipe bombs) in violation of 26 U.S.C. § 5861(d). In count four, Thomas was charged with distributing and aiding and abetting the distribution of crack for the November 2, 1990, sale to Bouchard in violation of 18 U.S.C.s 2 and 21 U.S.C. § 841(a)(1). Finally, in count five, Thomas was charged with distributing and aiding and abetting the distribution of in excess of fifty grams of crack for the November 14, 1990, sale to Bouchard in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1).
 
 
 15
 After a four-day jury trial, Thomas was convicted of all four counts. On December 23, 1991, Thomas was sentenced on counts one, four, and five to concurrent terms of 188 months' imprisonment, and on count three to a concurrent term of sixty months, followed by a five-year period of supervised release. Thomas was also ordered to pay a special assessment of $200.[4]
 
 
 16
 Thomas appeals.
 
 II
 
 17
 All of the arguments that Thomas raises on appeal concern evidentiary rulings made by the district court which he claims deprived him of a fair trial. Only a few of these rulings merit discussion.
 
 
 18
 * At trial, the government introduced evidence concerning the two handguns recovered during the February 6, 1991, search of Thomas' address. The district court did not allow the handguns themselves to be admitted or displayed to the jury. However, the district court allowed testimony that the handguns were seized and allowed a photograph of each gun to be admitted into evidence. The district court also instructed the jury that the possession of firearms could not be considered as proof of the character of the defendant, but rather could be considered as probative of the existence of Thomas' membership in a drug conspiracy. The district court gave the following instruction:
 
 
 19
 [U]nder the law of Maryland it is not necessarily against the law to have a handgun in your possession if you wish to have it, and no permit is required to have a handgun. Also, the Defendant is not charged here with any criminal violation stemming from these or other guns that you might hear evidence of. However, you may consider this evidence if you find that it is probative of the existence of the Defendant's membership in a drug conspiracy; but again, in and of itself, the possession of the firearms in one's residence is not unlawful.
 
 
 20
 Joint Appendix at 37. Thomas argues that the admission of the evidence concerning the handguns constitutes reversible error. We disagree.
 
 
 21
 We have on numerous occasions addressed the relevancy and admissibility of firearms in drug conspiracy cases and have consistently upheld the admission of evidence of firearms as relevant to the issues raised by such cases. See United States v. Ricks, 882 F.2d 885, 892 (4th Cir. 1989) (firearms relevant in drug cases), cert. denied, 493 U.S. 1047 (1990); United States v. Collazo, 732 F.2d 1200, 1206 (4th Cir. 1984) (same), cert. denied, 469 U.S. 1105 (1985). Other circuits have also recognized the relevancy of evidence of firearms in drug conspiracy cases. See, e.g., United States v. Blackman, 897 F.2d 309, 317 (8th Cir. 1990) (firearm seized in defendant's apartment relevant to the issue of intent to distribute cocaine); United States v. Green, 887 F.2d 25, 27 (1st Cir. 1989) (evidence of firearms relevant to corroborate witness' testimony and to establish existence of drug conspiracy); United States v. Payne, 805 F.2d 1062, 1065 (D.C. Cir. 1986) (guns admissible as evidence of tools of the trade in drug conspiracies). Thomas has offered nothing to compel us to depart from this established precedent. Under the circumstances, the district court acted well within its discretion in admitting this evidence.
 
 B
 
 22
 At trial, Bouchard testified as to the statements made to him by Haskins on November 9, 1990. As recounted above, at this meeting, Haskins described to Bouchard both the existence and profitability of her and Thomas' prior dealings in controlled substances. Specifically, she spoke of prior distribution of PCP by herself and Thomas, with the proceeds of those endeavors of Thomas' purchase of a MercedesBenz, and of the practice she and Thomas had of depositing drug proceeds in safe deposit boxes.
 
 
 23
 Thomas objected to these statements and the district court sustained the objection to the extent that the statements were evidence of bad character. The court gave a limiting instruction to the jury admonishing them to consider the statement only in terms of intent and knowledge under Fed. R. Evid. 404(b). The district court also ruled that the evidence was admissible as a statement by a coconspirator made in furtherance of the conspiracy under Fed. R. Evid. 801(d)(2)(E). On this point, the district court noted the statements were part of the talk that is engaged in to lull people into or get people to do business and stay associated with the conspiracy.
 
 
 24
 Thomas argues that Haskins' statements were not admissible under Fed. R. Evid. 404(b) or Fed. R. Evid. 801(d)(2)(E). For purposes of disposing of Thomas' argument, we need only discuss whether Bouchard's statements were admissible as a statement by a coconspirator in furtherance of the conspiracy under Fed. R. Evid. 801(d)(2)(E).
 
 
 25
 We review the district court's finding that a statement was made in furtherance of the conspiracy under the clearly erroneous standard. United States v. Leavis, 853 F.2d 215, 220 (4th Cir. 1988). Fed. R. 801(d)(2)(E) provides that a statement is not hearsay if made "by a coconspirator of a party during the course of and in furtherance of the conspiracy." Before a coconspirator's statement can be admitted into evidence against another coconspirator, the government must demonstrate: (1) the existence of a conspiracy, (2) the defendant and the declarant were both members of the conspiracy, and (3) the statement was made in the course of and in furtherance of the conspiracy. Bourjaily v. United States, 483 U.S. 171, 175 (1987). To be admissible under Fed. R. Evid. 801(d)(2)(E), the statement need not actually further the conspiracy, United States v. Reyes, 798 F.2d 380, 384 (10th Cir. 1986), but rather the statement need only be made in furtherance of the conspiracy. Id. "It is enough that they be intended to promote the conspiratorial objectives." Id. (citations omitted).
 
 
 26
 Thomas does not challenge the existence of a conspiracy to distribute crack or his or Haskins' membership in it. Rather, the crux of Thomas' attack on the district court's ruling is that Haskins' statements "involve a conspiracy separate and apart from any conspiracy involving the sale and distribution of cocaine and cocaine base for which ... Thomas was charged in the instant case." Appellant's Brief at 11. In other words, Thomas argues that the statements were not made "in furtherance of the conspiracy" charged in the indictment and, therefore, were inadmissible.
 
 
 27
 We believe the district court's finding that Haskins' statements were made in furtherance of the conspiracy to distribute crack charged in the indictment is not clearly erroneous. In their proper context, Haskins' statements promoted the main conspiratorial objective-the distribution of crack. At the time the statements were made, Bouchard was awaiting Thomas' arrival so that they could consummate a drug transaction involving crack. Such statements as those used by Haskins are employed in the drug business, especially prior to a transaction involving a relatively unknown purchaser such as Bouchard, to demonstrate experience, power, obtain confidence, and often, to entice people to continue to do business with the organization. In this light, her statements were made "in furtherance of the conspiracy," and were not simply "idle conversation." United States v. Urbanik, 801 F.2d 692, 698 (4th Cir. 1986) (statement not "in furtherance of conspiracy" where it "was merely a casual aside to the discussion of" matters not involving the conspiracy). Our holding is entirely consistent with the case law defining what constitutes a statement "in furtherance of the conspiracy" for Fed. R. Evid. 801(d)(2)(E) purposes. See, e.g., United States v. Leisure, 844 F.2d 1347, 1361-62 (8th Cir.) (evidence of coconspirator's statement regarding prior drug dealings admissible under Fed. R. Evid. 801(d)(2)(E) where statement was made to solidify and facilitate the conspiracy), cert. denied, 109 S. Ct. 324 (1988); United States v. McLernon, 746 F.2d 1098, 1105 (6th Cir. 1984) (statement falls within the rubric of Fed. R. Evid. 801(d)(2)(E) if designed to gain trust and allegiance of coconspirators).
 
 C
 
 28
 At trial, over Thomas' objection, the district court admitted into evidence an envelope addressed to Thomas at Haskins' residence. The return address of the envelope indicated that Thomas was unemployed. Thomas argues that the envelope was inadmissible under Fed. R. Evid. 403 because the probative value of the envelope was substantially outweighed by the danger of unfair prejudice. We do not agree.
 
 
 29
 As part of its case, the government had the burden of demonstrating the existence of a conspiracy. As the government's theory of the case developed, it was apparent that many of the activities that furthered the conspiracy involved Haskins and occurred at Haskins' residence. The admission of this envelope was relevant as it corroborated Thomas' relationship with Haskins and his relationship with a residence that essentially acted as the headquarters of this conspiracy. Indeed, throughout the trial, Thomas attempted to distance himself from his mother and his mother's residence. This was a sound trial tactic in light of the magnitude of the drug activity occurring at that address. The envelope was also relevant to Thomas' knowledge of the substantial amount of illegal events occurring at this residence. Thus, the envelope was highly relevant to the issues raised in this case. In short, despite the fact that the envelope indicated that Thomas was unemployed, we cannot say that the district court abused its discretion when it determined the probative value of the envelope was not outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. Finally, even if the envelope was improperly admitted, its admission does not constitute reversible error in light of the truly overwhelming evidence of guilt in this case.
 
 D
 
 30
 We have carefully reviewed Thomas' other challenges to the district court's evidentiary rulings and find them to be without merit.
 
 III
 
 31
 For the reasons stated herein, Thomas' conviction is affirmed.
 
 AFFIRMED
 
 
 [1]
 Coconspirator Rudolph Chase was present during this transaction
 
 
 [2]
 Rudolph Chase and Parker testified at trial that Thomas was the source of the crack they sold Bouchard on January 24, 1991
 
 
 [3]
 From the record, it is not clear what role Lnu played in the conspiracy other than his alleged presence at the November 14, 1990, transaction that involved 62.7 grams of crack. It is equally unclear whether Lnu was ever brought before the district court
 
 
 [4]
 Haskins pleaded guilty to the conspiracy count and one count of possession of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c) (count ten), and was sentenced to 150 months' imprisonment. Similarly, Rudolph Chase pleaded guilty to the conspiracy count and a violation of 18 U.S.C. § 924(c) (count eight), and was sentenced to 138 months' imprisonment. The indictment as it pertained to Parker and Agnes Chase was dismissed pursuant to Fed. R. Crim. Proc. 48(a)