UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 92-2503
_____


UNITED STATES OF AMERICA,

                                        Plaintiff-Appellee,

                    versus

JOSE ANTONIO PUIG-INFANTE,
a/k/a ALEJANDRO MONTANA,
MARIA ABIGAIL PUIG,
JUAN ERNESTO CASTRO-CUELLAR,
ARACELI CASTRO, PERLA DE LOS SANTOS,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court for the
Southern District of Texas
_____
(April 13, 1994)


Before JOHNSON, GARWOOD and JOLLY, Circuit Judges.

GARWOOD, Circuit Judge:

     Defendants-appellants were charged with and convicted of
participating in a conspiracy involving the importation of
marihuana from Mexico into the United States.  Araceli Castro,
Perla De Los Santos, Maria Abigail Puig (Abigail Puig), Juan
Ernesto Castro-Cuellar (Juan Castro), and Jose Alejandro Puig-
Infante (Jose Puig) were convicted of conspiracy, importation, and
other drug charges.  Appellants raise numerous issues on appeal.
We affirm in part, reverse in part, and vacate and remand in part.

## Facts and Proceedings Below

The story of this conspiracy begins sometime in 1986 or 1987, in Monterrey, Mexico, when Don Roman (Roman) entered into an agreement with Hector Villareal-Rojas (a/k/a Tito) to supply Tito with marihuana from Mexico. The two agreed that Roman would arrange for the marihuana to be driven from the interior of Mexico, across the United States border, and into Houston. Tito arranged on his own for distribution of the marihuana in Houston once it was delivered to him.

In 1987, Roman was arrested and his part of the operation was taken over by one of the delivery drivers, Alejandro Acosta (Acosta), and his family. Acosta would arrange to transport the marihuana from the interior of Mexico to the vicinity of Monterrey, Mexico, where it would be stored while awaiting transportation to the border city of Nuevo Laredo, Mexico, and ultimately into the United States through Laredo, Texas. Initially, Acosta was assisted by his wife, Martha Idalia Garcia-Bernal (a/k/a Martha Acosta), by his sisters, appellant Araceli Castro, appellant Perla De Los Santos, and appellant Abigail Puig (collectively, the sisters), and by his brother-in-law, appellant Juan Castro, as well as by various minor participants. Acosta's wife, sisters, and brother-in-law supplied the drivers to transport the marihuana (in what were known as runs or loads) from Monterrey to Nuevo Laredo, across International Bridge No. 2 into the United States at Laredo, through the United States Border Patrol checkpoint station on Interstate 35, and on to Houston. Additional such runs were made to Florida, Georgia, and San Antonio, Texas.

The organization developed a standard operating procedure. First, drivers were recruited and briefed on the procedures by one of the sisters. Aided by friends and relatives, the sisters would provide the drivers with documents and permits for travel in the Mexican interior. The drivers would then travel to Sabinas or Montemorelos, Mexico, where the vehicles were loaded with marihuana. An amount of marihuana ranging from forty to one hundred pounds would be divided into two-pound plastic bundles that were painted black to minimize detection and concealed in the fenderwells, under the front and rear bumpers, in the spare tire compartments, and in false gas compartments in the late model vehicles. The vehicles used for the runs were purchased by the organization and registered in the name of one of the drivers, to conceal the true ownership and purpose of their use.

After loading the marihuana, the drivers would return to Nuevo Laredo, wash their vehicles, and remove their Mexican travel sticker so that border patrol agents would not realize that they had been to the interior. From Nuevo Laredo they would cross the international border into Laredo. Once across the border, the drivers reported their safe passage to one of the sisters or to Martha Acosta; they reported again after they passed through the checkpoint at Cotulla, Texas. The loads were then delivered to Tito in Houston. After Tito unloaded the vehicles and weighed the marihuana, either he or the driver reported the number of pounds to the Acosta sisters in Laredo. The driver would then return to Laredo, often with cash payments for the load.

Appellant Jose Puig entered the conspiracy shortly after his

release from the Webb County Jail on October 14, 1988. In December of 1988, Alejandro Acosta was arrested; after his arrest he directed his end of the operation from prison, and Tito began dealing directly with the sisters. After Acosta's arrest, the Puigs established a modus operandi somewhat distinct from Perla De Los Santos and the Castros, picking up their marihuana in different locations in Mexico and generally delivering the contraband to Georgia or Florida. Perla De Los Santos and the Castros continued to make their deliveries to Houston.

In February 1989, the Drug Enforcement Administration (DEA) seized a vehicle containing a load of marihuana which was registered in the name of one of the drivers, Gloria Valles (Valles). When confronted by the DEA, Valles agreed to become a paid informant. As part of the arrangement, Valles tape recorded a number of conversations with the appellants and also assisted the DEA in introducing into the conspiracy a confidential informant. In addition to the inroads into the conspiracy made through Valles, the DEA was also able to secure the cooperation of two other drivers who worked for the organization,[1] as well as to introduce

---

[1]     Two drivers employed by the Castros and Perla De Los Santos, Bruce Coggins (Coggins) and Mario Sergio Cruz (Cruz), agreed to cooperate with the DEA. Coggins agreed to become a DEA informant after he was apprehended by United States Customs agents while trying to cross the International Bridge with a carload of marihuana. While working with the DEA, Coggins began driving loads for Jose Puig. During his tenure as a driver for the organization, Coggins tape recorded several conversations he had with the Puigs and Castros. Additionally, Coggins introduced an undercover DEA agent to Juan Castro, who later offered the agent a job running loads of marihuana. Cruz agreed to become an informant for the DEA after he was apprehended by Border Patrol with sixty-three pounds of marijuana in the trunk of the vehicle he was driving. Thereafter, Cruz tape-recorded several

other undercover DEA agents into the conspiracy.

DEA surveillance lasted two years and the investigation produced a substantial amount of information about the conspiracy. On August 8, 1991, a grand jury indictment was returned against appellants Araceli Castro, Perla De Los Santos, Abigail Puig, Jose Puig, and Juan Castro charging twenty-four violations of Title 21 Controlled Substances Act and Title 18 Racketeering Act.[2] The indictment alleged that the appellants were participants in a conspiracy lasting from 1987 to 1991. Specifically, all of the appellants were charged with conspiracy to import in excess of 1,000 kilograms of marihuana, in violation of 21 U.S.C. §§ 963, 952(a) and 960(a)(1), and with conspiracy to possess with intent to distribute in excess of 1,000 pounds of marihuana, in violation of 21 U.S.C. §§ 846 and 841(a)(1). They were also charged with aiding and abetting the importation of marihuana, in violation of 21 U.S.C. §§ 952(a) and 960(a)(1); aiding and abetting the possession of marihuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); and, aiding and abetting money laundering, in violation of 18 U.S.C. §§ 2, 1956(a)(1)(A)(i). Araceli Castro, Perla De Los Santos, and Abigail Puig were also charged with engaging in a Continuing Criminal Enterprise, in violation of 21 U.S.C. § 848. Finally, Juan Castro and Araceli Castro were charged with knowingly employing a minor to assist them in avoiding

conversations he had with Araceli Castro, Perla De Los Santos, and Juan Castro.

[2] The indictment also charged eleven additional co-conspirators, each of whom eventually pleaded guilty to the charges, pursuant to plea agreements.

5

detection and apprehension for the conspiracy to possess with the intent to distribute and the underlying possession offenses, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 861(a)(1).

The case was tried before a jury in the United States District Court for the Southern District of Texas, and on April 2, 1992, the jury returned a guilty verdict on all counts against all appellants except Perla De Los Santos. Perla De Los Santos was acquitted on the Continuing Criminal Enterprise charge, one count of importation, and one count of possession with intent to distribute, but was convicted of all remaining charges.

The district court, with one exception noted below, adopted the findings and recommendations of the presentence investigation reports (PSRs) for all of the appellants, and sentenced them accordingly. The court sentenced Perla De Los Santos to concurrent sentences totalling 240 months, followed by 8 years' supervised release. Araceli Castro was sentenced to concurrent sentences totalling 292 months, followed by 5 years' supervised release. Juan Castro was sentenced to concurrent sentences totalling 285 months, followed by 10 years' supervised release.[3] Abigail Puig was sentenced to concurrent sentences totalling 292 months, followed by 10 years' supervised release. Finally, after modifying the PSR's finding regarding the amount of marihuana attributable to Jose Puig under the Sentencing Guidelines, the court sentenced Jose Puig to concurrent sentences totalling of 292 months, followed by

---

[3]     The district court ordered that all of Juan Castro's sentences run concurrent with the remaining time on his December 19, 1991, conviction in separate proceedings in the Western District of Texas for marihuana trafficking.

10 years' supervised release.    Following sentencing, the appellants each timely filed a notice of appeal to this court.

## Discussion

On appeal, appellants assert numerous claims of error, including the following contentions:  (1) the existence of a material variance between the indictment and the proof adduced at trial; (2) the government's failure to adequately prove certain of the money laundering charges; (3) the failure of the court to make proper findings under the Sentencing Guidelines; (4) the improper enhancement of sentences for prior convictions; (5) the insufficiency of evidence to support the conviction for employment of a minor to assist in drug trafficking; (6) the insufficiency of the evidence to support conviction for importation of marihuana; (7) the inclusion of prejudicial, explanatory parentheticals in transcripts of tape recorded conversations; and (8) improper judicial comments at trial.  We consider these issues in this order.

I.   Material Variance

Araceli Castro, Perla De Los Santos, Abigail Puig, and Jose Puig argue that a material variance existed between the single conspiracy alleged in the indictment and the evidence adduced at trial.  The appellants contend that the evidence proved the existence not of a single, overarching conspiracy, but of several separate and distinct conspiracies.  Jose Puig, Abigail Puig, and Perla De Los Santos claim that the evidence demonstrated not a single organization with a common goal, but instead two separate marihuana importing and distributing networks that operated

7

independently of each other, one run by the Castros and Perla De Los Santos, the other run by the Puigs. Araceli Castro claims that the evidence established the existence of four or five distinct networks competing for business.

"A material variance occurs when a variation between proof and indictment occurs, but does not modify an essential element of the offense charged." *United States v. Thomas*, 12 F.3d 1350, 1357 (5th Cir. 1994). "We will not reverse a conviction for such a variance in the evidence unless 1) the defendant establishes that the evidence the government offered at trial varied from what the government alleged in the indictment, and 2) the variance prejudiced the defendant's substantial rights." *United States v. Jackson*, 978 F.2d 903, 911 (5th Cir. 1992) (citing *United States v. Richerson*, 833 F.2d 1147 (5th Cir. 1987) and *Berger v. United States*, 55 S.Ct. 629 (1935)), *cert. denied*, 113 S.Ct. 2429 (1993).

*A. Variance*

The indictment charged two conspiracies lasting from 1987 through the date of the indictment: conspiracy to import marihuana in violation of 21 U.S.C. § 963, and conspiracy to possess marihuana with intent to distribute it in violation of 21 U.S.C. § 846. To establish conspiracy the government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate the narcotics laws, (2) that each alleged conspirator knew of the conspiracy and intended to join it, and (3) that each alleged conspirator did participate in the conspiracy. *United States v. Maseratti*, 1 F.3d 330, 337 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 1096 (1994); *United States v. Carter*, 953 F.2d

8

1449, 1454 (5th Cir.), *cert. denied*, 112 S.Ct 2980 (1992). In determining whether the government proved a single conspiracy as charged, we examine the following factors: 1) whether there was a common goal, 2) the nature of the scheme, and 3) whether the participants in the various dealings overlapped. *Jackson*, 978 F.2d at 911. "We must affirm the jury's finding that the government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt." *United States v. DeVarona*, 872 F.2d 114, 118 (5th Cir. 1989).

Here, the government produced evidence that the sisters used common sources of supply, the same method of importation, some of the same drivers, and a common stash house in Houston. Moreover, Tito, the buyer in Houston, testified that he received loads from all three sisters: approximately forty loads from the Puigs, thirty from the Castros, and twenty from De Los Santos. In sum, the jury was presented with evidence from which it could reasonably infer that the defendants were involved in a single conspiracy between 1987 and 1991. Hence, the appellants failed to establish a fatal variance between indictment and proof.

B.  *Prejudice*

Even if the appellants could establish that some of the proof at trial varied from the allegations in the indictment, they must still prove that such a variance prejudiced their substantial rights. In our cases addressing the prejudice to a defendant resulting from variance between the allegations in the indictment

9

and some of the proof adduced at trial, our concern is that "the indictment notifies a defendant adequately to permit him to prepare his defense, and does not leave the defendant vulnerable to a later prosecution because of failure to define the offense with particularity." *United States v. Hernandez*, 962 F.2d 1152, 1159 (5th Cir. 1992) (citing *United States v. Lokey*, 945 F.2d 825, 832-33 (5th Cir. 1991), and *United States v. Richerson*, 833 F.2d 1147, 1155 (5th Cir. 1987)).In those cases where we have considered an alleged variance between a single-conspiracy indictment and certain evidence arguably showing multiple conspiracies, "this concern focuses on the danger of transference of guilt, *i.e.*, the danger that despite demonstrating his lack of involvement in the conspiracy described in the indictment, a defendant may be convicted because of his association with, or conspiracy for other unrelated purposes with, codefendants who were members of the charged conspiracy." *Hernandez*, 962 F.2d at 1159 (citations omitted).

This concern, however, may be eliminated when the trial court gives the jury an instruction warning against the transference of guilt. *See United States v. Guerra-Marez*, 928 F.2d 665 (5th Cir.) (noting that a precautionary instruction regarding transference of guilt "provid[ed] adequate safeguards for the rights of the individual defendants"), *cert. denied*, 112 S.Ct. 322 (1991); *cf*. *Kotteakos v. United States*, 66 S.Ct. 1239 (1946) (overturning convictions where indictment charged one conspiracy, proof established multiple conspiracies, and judge failed to give cautionary instruction). Such an instruction "forcefully reminds

10

the jury that it must acquit the defendant if it concludes that he was not a member of a conspiracy charged against him, even if it finds that he was a member of an uncharged conspiracy." *Hernandez*, 962 F.2d at 1159. In the case *sub judice*, the district court gave the jury a comprehensive multiple conspiracy instruction. The court instructed the jury

> "that proof of several separate conspiracies is not proof of a single overall conspiracy charged in the indictment, unless one of the several conspiracies which is proved is a single conspiracy which the indictment charges. What you must do is determine whether the single conspiracy charged in the indictment exists between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the defendant as to that charge or charges. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.
> If you find that a particular defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit the defendant. In other words, to find a defendant guilty you must find that he was a member of the conspiracy charged in the indictment and not some separate conspiracy."

The court's instruction safeguarded the appellants from the danger that they could be convicted for the overarching conspiracy alleged in the indictment solely by virtue of their participation in any one of a number of multiple conspiracies.

We find that there was no material and prejudicial variance between the indictment and the proof adduced at trial.

II. Money Laundering

Jose Puig, Abigail Puig, Araceli Castro, and Perla De Los Santos contend that the evidence was insufficient to support their convictions for money laundering under 18 U.S.C. § 1956(a)(1)(A)(i). In reviewing challenges to sufficiency of the evidence, this Court views the evidence in the light most favorable

11

to the jury verdict and affirms if a rational trier of fact could have found that the government proved all essential elements of the crime beyond a reasonable doubt. *See United States v. Ruiz*, 987 F.2d 243, 259 (5th Cir.), *cert. denied*, 114 S.Ct. 163 (1993). All credibility determinations and reasonable inferences are to be resolved in favor of the jury's verdict. *See id*. To secure a conviction under section 1956(a)(1), the government must prove that the defendant 1) conducted or attempted to conduct a financial transaction, 2) which the defendant then knew involved the proceeds of unlawful activity, 3) with the intent to promote or further unlawful activity.[4] *United States v. Ramirez*, 954 F.2d 1035, 1039 (5th Cir.), *cert. denied*, 112 S.Ct. 3010 (1992).

*A.   Jose Puig and Abigail Puig*

The Puigs' conviction on count seventeen (17) under section 1956(a)(1) arises out of a marihuana run made to Florida in May of 1989.[5] Valles testified that Jose and Abigail Puig requested that she accompany Abigail on a trip from Laredo to Florida. On May 22, 1989, Valles and Abigail Puig drove from Laredo to San Antonio, Texas, where they picked up a load of marihuana. From San Antonio,

---

[4]    Section 1956 provides, in relevant part:

> "(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activitySQ
>     (A)(i) with the intent to promote the carrying on of specified unlawful activity."  18 U.S.C. § 1956(a)(1).

[5]    Abigail Puig does not challenge her conviction on count twelve (12) charging a November 1988 violation of 18 U.S.C. § 1956(a)(1)(B)(i).

Valles and Abigail Puig continued on to Okeechobee, Florida. After arriving in Florida, they rented a hotel room and contacted Jose Puig. The next day, two buyers, Terry and Lettie Willis, came to the hotel room and gave Abigail Puig $47,000 in exchange for the marihuana. After the exchange, Valles and Abigail Puig returned to Laredo with the money. Valles testified that the last time she saw the money it was still in the possession of Abigail Puig. There was no evidence of what, if anything, happened to the money thereafter.

The Puigs contend that, under these facts, they cannot be convicted of a violation of section 1956(a)(1)(A)(i) because the government failed to establish all of the requisite elements of the offense. Specifically, the Puigs argue that the government was required to prove that they engaged in a financial transaction involving the proceeds of an unlawful activity. And, although the money Abigail Puig received in exchange for the marihuana was the proceeds of unlawful activity, her mere subsequent transportation of those proceeds by car does not constitute a "financial transaction" within the meaning of the statute. We agree.

Section 1956 defines "financial transaction" as "a *transaction* which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments . . . ." 18 U.S.C. § 1956(c)(4)(A) (emphasis added). By definition, then, a "financial transaction" must, at the very least, be a "transaction," *i.e.*, "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition" or some action involving a financial institution or

13

its facilities.[6]  18 U.S.C. § 1956(c)(3).

Although it is clear that the transportation of money by car is not a "purchase, sale, loan, pledge, or gift," whether such transportation is a "transfer" or "delivery" is less clear. However, the statute makes plain that for something (not involving a financial institution or its facilities) to be a transaction, it must be a "disposition."  "Disposition" most commonly means "a placing elsewhere, a giving over to the care or possession of another."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 654 (1961).

Considering the facts adduced at trial, we are persuaded that there was no showing of any action concerning the sales proceeds related to a financial institution, and, further, that the government failed to demonstrate that Abigail Puig effected a disposition of the proceeds of the sale.  Indeed, there is no evidence that Abigail Puig did *anything* with the money after she and Valles returned to Laredo.  The only evidence offered in this regard was the following exchange between the prosecutor and Valles:

---

[6]    The full text of section 1956(c)(3) provides:

"(c) As used in this sectionSQ
                    * * *
(3) the term 'transaction' includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected . . . ."  18 U.S.C. § 1956(c)(3).

14

"MR. MCCORMICK [the prosecutor]:  After you got to Laredo, what happened to the money if you know?

MS. VALLES:  She kept the money.  I don't know what happened to it.

MR. MCCORMICK:  The last time you saw it, where was it?

MS. VALLES:  It was hidden in the car, under the dash of the car.

MR. MCCORMICK:  Did you take any of the money?

MS. VALLES:  No, sir.

MR. MCCORMICK:  Who was the last person that had control SQthat you saw, that had control of that car when it had the money in it?

MS. VALLES:  Ab[igail Puig]."

The only permissible inference from the government's proof is that Abigail was in possession of the proceeds of unlawful activity. Nowhere is there any evidence that Abigail effected a disposition of those proceeds; *i.e.,* that she "g[ave] over to the care or possession of another" the money she had received in exchange for the marihuana.  Without such proof, her mere transportation of the proceeds of unlawful activity is not a transaction within the statute.  For this reason, the government failed to establish the facts necessary to find that Abigail Puig engaged in a financial transaction within the meaning of section 1956.  As the only basis for Jose Puig's conviction of this charge was that he aided and abetted Abigail's asserted violation, his count seventeen (17) section 1956 conviction is infirm for the same reason. Accordingly, we reverse the Puigs' convictions under count seventeen (17) for money laundering.

Our conclusion is consistent with that of the Sixth Circuit in

15

*United States v. Samour*, 9 F.3d 531 (6th Cir. 1993). In a case factually analogous to the instant case, the *Samour* court held that "merely transporting [drug money concealed in automobile] does not meet the definition of 'financial transaction' for purposes of the money laundering statute." *Id*. at 536.

Our conclusion is also in accord with our reasoning in *United States v. Ramirez*, 954 F.2d 1035 (5th Cir. 1992), in which we concluded that the government's proof of the possession of drug proceeds was insufficient to establish a financial transaction under section 1956. In *Ramirez*, the defendant was convicted of money laundering after DEA agents searched a house used by the drug trafficking ring of which the defendant was a part and discovered a shoe box containing $132,980 in cash. We concluded that although "the jury could infer that the money found [in the house] represented proceeds from illegal activity," the evidence did not "allow the inference that Sanchez transferred, delivered, moved, or otherwise disposed of the money as required by statute." *Id*. at 1039-40.

The government contends that "the delivery and transfer of cash from [the Willises] to Abigail in Florida, and her subsequent movement of these cash proceeds interstate, constitutes a financial transaction." However, because the money did not become *proceeds* of unlawful activity until the sale of the marihuana was *completed*, what the government describes as one transaction is actually two separate actions: the first, the sale by the Puigs of the marihuana to the Willises and their payment to Abigail Puig for same, is a transaction (and an unlawful one) but is not shown to

16

have been one which involved the *proceeds* of unlawful activity; the second, Abigail Puig's transportation of the money from Florida to Laredo, involves the proceeds of unlawful activity but is not a *transaction*.

The government also contends that because the facts of the case *sub judice* resemble those of *United States v. Gallo*, 927 F.2d 815, 822 (5th Cir. 1991), and *United States v. Hamilton*, 931 F.2d 1046 (5th Cir. 1991), we must follow the results of those cases and affirm the Puigs' conviction. In *Gallo*, the defendant (Gallo) was convicted of violating section 1956 following his arrest while transporting a box containing approximately $300,000 cash in his car on an interstate highway. Evidence offered by the government suggested that the defendant had accepted delivery of the cash from Cruz, a suspected drug trafficker, and that Cruz had been given the money in exchange for twenty-five kilograms of cocaine. Based on these facts, we concluded that the defendant's "transportation of the proceeds of drug trafficking affected interstate commerce, and that there is sufficient evidence to sustain his money laundering conviction." *Gallo*, 927 F.2d at 823. The question whether the evidence was sufficient to establish the "transaction" requirement of the statute, however, was not addressed by the *Gallo* court.

In *Hamilton*, the defendant was convicted of money laundering for mailing approximately $18,000 in drug activity proceeds to Perez, a drug dealer in California. On appeal we concluded, without discussion, that "the terms of the statute prohibit mailing the proceeds of drug sales." *Hamilton*, 931 F.2d at 1051. Accordingly, we affirmed the conviction.

17

Although the analysis of the transaction issue is minimal in *Hamilton* and nonexistent in *Gallo*, unlike the case *sub judice*, both *Hamilton* and *Gallo* clearly involve a "disposition" of the proceeds of unlawful activity. In *Gallo*, proceeds of a drug sale were delivered from Cruz to the defendant; in *Hamilton*, the defendant attempted to deliver the proceeds of drug activity to Perez. We conclude that *Gallo* and *Hamilton* are not controlling in the present context.

B. *Perla De Los Santos*

Perla De Los Santos was convicted under section 1956(a)(1) for purchasing an automobile with the proceeds of drug activity. She appeals this conviction, claiming that the evidence was insufficient to prove that the money used to purchase the automobile was the proceeds of unlawful activity.

The evidence showed that Perla De Los Santos participated in the conspiracy alleged in the indictment and that, in furtherance of the conspiracy, she purchased a 1984 Oldsmobile Cutlass Sierra for $3,180 on August 29, 1988. On November 28, 1988, the vehicle was seized by the DEA when the driver attempted to cross the border with a load of marihuana. Additionally, the government offered evidence that for the years 1986 through 1990, Perla De Los Santos and her husband, Emerico De Los Santos, filed only one income tax return, that for 1990, filed April 15, 1991, claiming only $959.31 in income.

Although "proof of [a defendant's] limited income, by itself, is insufficient to support" a conviction under section 1956, *United States v. Munoz-Romo*, 947 F.2d 170, 178 (5th Cir. 1991), *vacated on*

18

*other grounds*, 113 S.Ct. 30 (1992), "[e]vidence of a differential between legitimate income and cash outflow is sufficient for a money-laundering conviction, even when the defendant claims income from additional sources." *United States v. Webster*, 960 F.2d 1301, 1308 (5th Cir.), *cert. denied*, 113 S.Ct. 355 (1992) (citing *United States v. Jackson*, 935 F.2d 832, 839-42 (7th Cir. 1991)). Moreover, "the jury is entitled to consider such proof in combination with additional evidence, such as 'evidence of [a] defendant's drug trafficking.'" *Munoz-Romo*, 947 F.2d at 178 (quoting *United States v. Blackman*, 897 F.2d 309, 317 (8th Cir. 1990)). Viewing the evidence in the light most favorable to the jury verdict, we will affirm Perla De Los Santos' conviction if a rational trier of fact could have reasonably concluded that the car was purchased with drug proceeds. *See Ruiz*, *supra*, 987 F.2d at 259.

Here, the jury was presented with evidence from which they could infer that Perla De Los Santos had minimal legitimate income in the years (1986 through 1990) surrounding her 1988 purchase of the vehicle for $3,180 cash. The government also presented substantial evidence that De Los Santos was involved in a continuing, self-funded drug organization, the operation of which began well before and continued after August 29, 1988. Considering the "differential between legitimate income and cash outflow" in connection with the ample evidence that De Los Santos was engaged as a principal in on-going, large scale drug trafficking activities at and well before the time of the cash purchase of the automobile for use in the conspiracy, we conclude that a rational trier of

19

fact could reasonably infer that the funds used to purchased the vehicle were the proceeds of unlawful activity. We therefore affirm Perla De Los Santos' conviction under section 1956.

    *C.    Araceli Castro*

Araceli Castro was convicted of money laundering for payments made to Gloria Valles in June and August of 1988. At trial, Valles testified that she was to be paid $3,000 to provide a driver to Juan Castro and Araceli Castro for a drug run between Monterrey and Laredo on June 21, 1988. After the run was completed, Valles went to the Castro residence, where she waited with Araceli Castro while Juan Castro left to get her payment. Shortly thereafter, Juan Castro called the Castro residence from the Puig residence and put Abigail Puig on the line to speak with Valles. Abigail Puig told Valles that she did not have the entire, agreed-upon payment, and asked Valles if she would accept half of the money at that time and the balance later. Valles agreed to accept partial payment. Fifteen minutes later, Juan Castro returned to the Castro residence and, in the presence of Araceli Castro, gave Valles $1,500 cash with the understanding that the money came from Abigail Puig.

In August of 1988, when Valles requested that Abigail Puig pay her the balance of the $3,000, Abigail Puig told Valles that she and Araceli Castro had agreed to split the expenses for the June 21, 1988, drug run. After several requests for the rest of the money, Valles was instructed by Araceli Castro to come to the Castro residence for payment. When Valles arrived, however, Araceli Castro was not home, but her maid gave Valles $1,000 cash. Later in the same month, Araceli Castro called Valles again and

told her to come to her house to pick up a payment, and again the Castros' maid gave Valles $1,000 cash.

In her appeal, Araceli Castro argues nothing more specific than that the government did not offer evidence that "she did any particular thing with proceeds from drug trafficking." Giving her the benefit of the doubt, we construe her argument on appeal to be that the government failed to prove that the cash payments made to Valles were the proceeds of unlawful activity. Thus, we must determine whether there was enough evidence presented to the jury to allow for the inference that the source of the payments made to Valles was profits from the marihuana trade.

In addition to Valles' testimony regarding these payments, the government presented evidence that for the years 1986 through 1990, neither Abigail Puig nor the Castros filed income tax returns. Moreover, the government presented substantial evidence of Araceli Castro's and Abigail Puig's involvement as principals in the on-going, large scale conspiracy well before and after the payments made in June and August of 1988. Thus, as was the case with Perla De Los Santos, a rational trier of fact could infer from Abigail Puig's and Araceli Castro's involvement in the conspiracy, coupled with the differential between legitimate income and cash outflow, that the cash payments made to Valles for her provision of a driver for the conspiracy were the proceeds of unlawful activities. Accordingly, we affirm Araceli Castro's conviction for money laundering under section 1956.

Araceli Castro also complains that the district court erred in failing to initially define "financial transaction" in its

21

instructions to the jury regarding the money laundering count.  In the initial charge, the court gave the jury the statutory definition of "transaction," stating that the term includes

> "a purchase, sale, loan, pledge, gift, transfer, delivery or other disposition and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency loans, extension of credit, purchase of sale of stock, bonds, certificate of deposit or other monetary instrument or any other payment, transfer or delivery by, through or to a financial institution . . . ."

The accuracy of this instruction is not challenged.  While the jury was deliberating, the government submitted a supplemental instruction defining "financial transaction" using the language of section 1956(c)(4)(A).  Araceli Castro's counsel joined in the objection made by counsel for Jose Puig, who argued that the giving of the supplemental instruction would confuse the jury's deliberations and undermine his chance for reversal on appeal.  At the request of defense counsel, the district court denied the government's supplemental instruction.

Because Araceli Castro did not request the instruction, and indeed prevented the court from curing any inadequacy in the initial charge, she failed to preserve the issue for appeal.  Her objection to the instruction's inclusion bars her present contention under the doctrine of invited error.  *United States v. Baytank (Houston), Inc.*, 934 F.2d 599, 606-607 (5th Cir. 1991).  Our review of this claim, therefore, is limited to plain error at the most.  Plain error is error so obvious and substantial that failure to notice it would affect the fairness, integrity, or public reputation of the judicial proceedings and would result in

22

manifest injustice. *United States v. Carreon*, 11 F.3d 1225, 1240 (5th Cir. 1994). Even without the charge's inclusion of the specific language of section 1956(c)(4)(A), we conclude that the instructions, taken as a whole, were at least minimally adequate to reflect the law. In any event, in the present context the requested instruction's absence did not so seriously impair Araceli Castro's ability to effectively present any defense as to amount to plain error. Hence, no reversible error is shown.

III. Sentencing Issues

Jose Puig, Perla De Los Santos, and Araceli Castro appeal the district court's finding of the quantity of marihuana attributable to each of them respectively under the Sentencing Guidelines (the Guidelines). Under section 2D1.1(a)(3) of the Guidelines, the offense level of a defendant convicted of a drug trafficking offense is determined by the quantity of drugs involved. This quantity includes both drugs with which the defendant was directly involved, and drugs that can be attributed to the defendant in a conspiracy as part of his "relevant conduct" under section 1B1.3(a)(1) of the Guidelines. The commentary to section 1B1.3(a)(1) defines relevant conduct for conspiratorial activity as the "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3(a)(1), comment. (n.1) (Nov. 1991).[7]

---

[7] The version of the Guidelines in effect from November 1, 1991, through October 31, 1992, applies to the appellants because they were sentenced on June 22, 1992. *United States v. Gross*, 979 F.2d 1048, 1050-51 (5th Cir. 1992) (citing 18 U.S.C. s

23

For a particular defendant, however, "reasonable foreseeability does not follow automatically from proof that [the defendant] was a member of the conspiracy." *United States v. Puma*, 937 F.2d 151, 160 (5th Cir. 1991), *cert. denied*, 112 S.Ct. 1165 (1992). "The reasonable foreseeability required [under the Guidelines] requires a finding separate from a finding that the defendant was a conspirator." *Id.* (citing *United States v. Warters*, 885 F.2d 1266, 1273 (5th Cir. 1989)). Thus, for a sentencing court to attribute to a defendant a certain quantity of drugs, the court must make two separate findings: (1) the quantity of drugs in the entire conspiracy, and (2) the amount which each defendant knew or should have known was involved in the conspiracy. *Id.* at 159-60.

The sentencing court may make an approximation of the amount of marihuana reasonably foreseeable to each defendant, and an individual dealing in large quantities of controlled substances is presumed to recognize that the drug organization with which he deals extends beyond his "universe of involvement." *United States v. Thomas*, 963 F.2d 63, 65 (5th Cir. 1992). When calculating the amount foreseeable to a defendant, a court may consider the defendant's relationship with co-conspirators and his role in the conspiracy. *United States v. Devine*, 934 F.2d 1325, 1338 (5th Cir.

---

3553(a)(4)). In the 1991 Guidelines, the above-quoted language was in the commentary to section 1B1.3(a)(1). In the 1992 amendments to the Guidelines, this language was incorporated into the body of section 1B1.3, which now reads in relevant part: "in the case of a jointly undertaken criminal activity [the defendant may be held accountable for], all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B) (Nov. 1993).

1991), *cert. denied*, 112 S.Ct. 954 (1992).  In arriving at this estimate the court may consider any information that has "'sufficient indicia of reliability to support its probable accuracy.'" *Thomas*, 963 F.2d at 64-65 (citations omitted).

We will uphold the factual findings made by a district court in its determination of a defendant's relevant conduct for sentencing purposes unless that figure is clearly erroneous. *United States v. Maseratti*, 1 F.3d 330, 340 (5th Cir. 1993); *United States v. Buckhalter*, 986 F.2d 875, 879 (5th Cir.), *cert. denied*, 114 S.Ct. 203 (1993).  A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole.  *United States v. Sanders*, 942 F.2d 894, 897 (5th Cir. 1991).

*A.    Araceli Castro*

Araceli Castro was sentenced to a term of imprisonment of 292 months.  Finding that she participated in an offense involving at least 3,000 kilograms but less than 10,000 kilograms of marihuana, the court calculated her base offense level at 34.  Araceli appeals her sentence on two grounds.  First, she contends that the trial court erred by accepting the assertions set forth in the PSR regarding the quantity of marihuana attributable to her.  This argument, however, is not supported by the facts.

In the PSR for Araceli Castro, the probation department concluded, *inter alia*, that a minimum of 4,046 kilograms of marihuana was attributable to (and reasonably foreseeable by) her.  Prior to sentencing, she filed objections to the PSR, contending that the amount attributed to her was based on unreliable

25

testimony. The district court overruled these objections and adopted the factual statements contained in the PSR. At the sentencing hearing, in response to an objection by Castro's counsel, the court stated explicitly that it had not merely accepted the assertions of the probation officer; the court explained that it based its decision to overrule the objections and adopt the PSR on "the testimony [the court] heard from the witness stand." Hence, Castro's contention that the district court relied solely on the assertions of the probation department is without merit.

Next, Castro argues that the district court erred by failing to make a specific finding regarding the amount of marihuana foreseeable to her. On review of a sentence imposed pursuant to section 1B1.3 of the Guidelines, we require the sentencing court to make an express finding that the conspiratorial activity at issue was reasonably foreseeable. *Puma*, 937 F.2d at 160; *Warters*, 885 F.2d at 1271-73. Moreover, Rule 32 of the Federal Rules of Criminal Procedure "requires the court either to make specific findings as to all contested facts contained in the PSR that the court finds relevant in sentencing, or determine that those facts will not be considered in sentencing." *United States v. Hooten*, 942 F.2d 878, 881 (5th Cir. 1991); FED.R.CRIM.P. 32(c)(3)(D). Rule 32 does not, however, "require a catechismic regurgitation of each fact determined and each fact rejected," *United States v. Sherbak*, 950 F.2d 1095, 1099 (5th Cir. 1992); "instead, we have allowed the district court to make implicit findings by adopting the PSR. This adoption will operate to satisfy the mandates of Rule 32 when the

findings in the PSR are so clear that the reviewing court is not left to 'second-guess' the basis for the sentencing decision." *Carreon*, 11 F.3d at 1230-31.

In Araceli Castro's case, the district court expressly adopted the facts set forth in the PSR. Additionally, after Castro's counsel questioned the factual basis for the PSR's calculation of the amount of marihuana attributable to her, the court explained that its decision to adopt the PSR's determination was based on the court's assessment of the testimony presented by the government. In so doing, the court resolved the sole factual issue from the PSR which was contested by Castro, satisfying the requirements of Rule 32.

*B.  Perla De Los Santos*

Perla De Los Santos was sentenced to a total of 240 months' imprisonment. Finding that she participated in an offense involving at least 3,000 kilograms but less than 10,000 kilograms of marihuana, the district court set her base offense level at 34, with a 4-point upward adjustment for being an organizer/leader in a criminal activity involving 5 or more participants. She appeals both the determination of her base offense level and the adjustment for her role in the offense.

The PSR for Perla De Los Santos concluded that a minimum of 4,046 kilograms of marihuana was attributable to her. De Los Santos objected to this determination, contending that the trial testimony supported a finding that only 400-700 kilograms of marihuana should be attributed to her. Other than simply making this assertion, however, she presented nothing to rebut the PSR's

27

findings.

Although a district court must resolve disputed issues of fact if it intends to use those facts as a basis for sentencing, *see* FED.R.CRIM.P. 32(c)(3)(D), the court can adopt facts contained in a PSR without inquiry, if those facts had an adequate evidentiary basis and the defendant does not present rebuttal evidence. *United States v. Rodriguez*, 897 F.2d 1324, 1328 (5th Cir.), *cert. denied*, 111 S.Ct. 158 (1990). Furthermore, the defendant has the burden of showing that information that the district court relied on in sentencing is materially untrue. *Id*.

Here, the district court adopted the PSR, which made the explicit finding De Los Santos could reasonably foresee the entire amount of marihuana trafficked by the conspiracy. The court underscored this finding, stating that all five of the defendants could have reasonably foreseen the actions of the members of the conspiracy done in furtherance of it. This conclusion is adequately supported by the record and is reasonable given the nature of the conspiracy, which was a family organization, run by Perla De Los Santos and her sisters, each of whom had an intimate understanding of the operation.

Perla De Los Santos next contends that the district court erred in its conclusion that she was an organizer or leader of the conspiracy. As best we can understand, her contention that she is less culpable is based on her acquittal on the charge of participating in a continuing criminal enterprise.

In determining whether a particular defendant is an organizer or leader, a court should consider such factors as

28

> "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment. (n.3) (Nov. 1991).

Additionally, the commentary to section 3B1.1 notes that there can "be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id*. We review a district court's finding that a defendant was an organizer or leader under the clearly erroneous standard. *United States v. Watson*, 988 F.2d 544, 550 (5th Cir. 1993), *cert. denied*, 114 S.Ct. 698 (1994). Moreover, the district court need only determine factual findings at sentencing by a preponderance of the evidence. *United States v. Angulo*, 927 F.2d 202, 204 (5th Cir. 1991).

Here, there is ample evidentiary support for the finding that Perla De Los Santos was an organizer of the conspiracy. Along with her two sisters, Perla De Los Santos was a founding member of this conspiracy. After Alejandro Acosta was arrested, Perla De Los Santos and her sisters took over his position as overseer of distribution. Additionally, there is evidence in the record that Perla De Los Santos recruited participants, including Valles, into the conspiracy; that she directed the actions of drivers and other participants; and that she accepted some of the payments for marihuana transactions. Thus, the district court's finding that Perla De Los Santos was an organizer or leader is adequately supported. *See United States v. Peters*, 978 F.2d 166, 170 (5th Cir. 1992); *United States v. Liu*, 960 F.2d 449, 456 (5th Cir.),

29

*cert. denied*, 113 S.Ct. 418 (1992).

C.  *Jose Puig*

Jose Puig was sentenced to a total of 285 months' imprisonment.  The district court set his base offense level at 34, the level specified in section 2D1.1(a)(3) for participation in an offense involving at least 3,000 kilograms but less than 10,000 kilograms of marihuana.  Jose Puig appeals his sentence, contending that the district court erred by attributing to him the entire amount of marihuana trafficked by the conspiracy.  He argues that because he was incarcerated for a substantial portion of the life of the conspiracy, he should be held accountable for less than the 4,086 kilograms attributed to him by the district court.  Jose Puig also argues that the district court failed to make specific findings as to whether the conduct of his co-conspirators was reasonably foreseeable to him.

When the conspiracy was formed, in December of 1987, Jose Puig was incarcerated; when the conspiracy ended, in August of 1991, Puig was also incarcerated.  He was released from custody on October 14, 1988, arrested again on June 15, 1990, and remained incarcerated throughout the remainder of the conspiracy.  After his release in October of 1988, Jose and Abigail Puig married and Jose became an integral part of the operation of the conspiracy.  Jose and Abigail Puig extended the distribution area of the conspiracy, importing marihuana from Mexico into Georgia and Florida.  Jose Puig's direct and overt involvement in the conspiracy lasted until June 15, 1990, when he was arrested in Houston while making a delivery of 55 pounds of marihuana.  At sentencing, the government

30

conceded that this delivery was part of the instant conspiracy.

Jose Puig's PSR concluded that the entire amount of marihuana involved in the conspiracySQ*i.e.*, a minimum of 4,086 kilogramsSQwas attributable to him.  Jose Puig filed objections to the PSR, which included, *inter alia*, an objection to attributing to him any amount of marihuana involved in the conspiracy before he was released from prison.  At the sentencing hearing, Jose Puig's counsel again asserted the objection that Puig could not reasonably foresee marihuana trafficked before he joined the conspiracy.  In response, the district court stated that "the *greater portion* of this conspiracy and conspiratorial conduct occurred after [Jose Puig] was released [from jail on October 14, 1988]."  Later, the court stated:

> "based on the evidence as I've heard it, the *majority* of the marijuana, if thatSQif that is the way I need to address it.  I'm not sure that there was significant testimony of loads of marijuana before 1988 that would concern me in sentencing him fair and equitably because the majority of the people who testified in this case as to specific loads that they hauled occurred in 1988 up through 1990 or there abouts . . . ."

The plain meaning of "majority" and "greater portion" is "a number greater than one half of a total."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, 1363 (1961).  As the sentencing court found that the instant conspiracy involved approximately 4,000 kilograms of marihuana, it is impossible for this Court to determine whether the sentencing court found anything more than that the quantity of marihuana foreseeable to Jose Puig was "a number greater than 2,000 kilograms."  Because the Guideline range at which Jose Puig was sentenced is triggered by a relevant conduct determination of 3,000

31

kilograms, we must remand to allow the district court to clarify its finding of the amount of marihuana attributable to Jose Puig.

Clearly, any amount of marihuana which was trafficked before October of 1988 cannot be attributed to Jose Puig because "'relevant conduct' as defined in section 1B1.3(a)(1)(B) is prospective only, and consequently cannot include conduct occurring before a defendant joins a conspiracy." *Carreon*, 11 F.3d at 1235-36. However, Jose Puig also contends that the marihuana trafficking activities of his co-conspirators which occurred after his June 15, 1990, arrest should not be attributed to him either.

If we interpret Jose Puig's contention to be that by virtue of his 1990 arrest and incarceration he terminated his involvement in the conspiracy, his argument fails. Ordinarily, a defendant is presumed to continue involvement in a conspiracy unless that defendant makes a "'substantial' affirmative showing of withdrawal, abandonment, or defeat of the conspiratorial purpose." *United States v. Branch*, 850 F.2d 1080, 1082 (5th Cir. 1988) (citation omitted), *cert. denied*, 109 S.Ct. 816 (1989). Indeed, "[a] member of a conspiracy continues to be responsible for acts committed by coconspirators even after the former's arrest unless he has withdrawn from the conspiracy." *United States v. Killian*, 639 F.2d 206, 209 (5th Cir.) (citations omitted), *cert. denied*, 101 S.Ct. 3014 (1981). To withdraw from a conspiracy, a defendant bears the burden of demonstrating that he has committed "[a]ffirmative acts inconsistent with the object of the conspiracy [that are] communicated in a manner reasonably calculated to reach conspirators." *United States v. U.S. Gypsum Co.*, 98 S.Ct. 2864,

32

2887 (1978); *Killian*, 639 F.2d at 209.  Because a defendant's incarceration is not an affirmative act on the part of a defendant, it cannot, *by itself*, constitute withdrawal or abandonment.  *See Branch*, 850 F.2d at 1083; *Killian*, 639 F.2d at 209.

Although Jose Puig has failed to demonstrate that he withdrew from the instant conspiracy, his incarceration may still have had some effect on the foreseeability of the acts of his co-conspirators occurring after his June 15, 1990, arrest.  The reasonable foreseeability required of section 2D1.4 requires a finding separate from a finding that the defendant was part of the conspiracy.  *United States v Puma*, 937 F.2d 151, 160 (5th Cir. 1991); *see also* U.S.S.G. § 1B1.3, comment. (n. 1)(Nov. 1993) ("the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator").  Hence, upon remand, the district court should consider specifically whether (and, if so, to what extent) Jose Puig's incarceration limited the foreseeability to him of any of the marihuana transactions that took place after his June 15, 1990, arrest.  The court should consider this foreseeability in light of the nature of the conspiracy, the nature of Jose Puig's involvement in the organization prior to his arrest, and the relationship or nexus between the conspiracy's transactions occurring before his arrest of which he is charged with knowledge and those which took place after his arrest.  The temporal proximity of the arrest to the termination of the conspiracy may also be important; the longer the

time between incarceration and termination, the more attenuated the connection between the defendant and the conspiracy.

Thus the district court on remand will need to expressly find the relevant amount of marihuana involved in the conspiracy after October 1988 and the portion thereof reasonably foreseeable to Jose Puig taking into account his June 1990 arrest.

IV.   Enhancement For Prior Conviction

Jose Puig, Abigail Puig, and Juan Castro contend that the district court erroneously enhanced their sentences for violation of 21 U.S.C. § 841 (possession of more than 1,000 kilograms of marihuana with the intent to distribute) and 21 U.S.C. § 960 (importation of more than 1,000 kilograms of marihuana).   The appellants claim that the court erred in concluding that they were subject to a mandatory minimum sentence of 20 years for committing a violation of the substantive provisions of sections 841 and 960, involving 1,000 kilograms or more of marihuana, *after* one or more prior felony drug convictions had become final.   Specifically, the appellants contend that the court was in error because the prior convictions relied upon for enhancement by the district court were not final at the time the appellants committed the substantive offenses.[8]

With regard to Juan Castro and Abigail Puig, their argument fails because the district court did not rely on the statutory enhancement provisions in fixing their sentences; rather, the court

_____

[8]   All three also contend that the government failed to timely file a notice to enhance their sentences for prior convictions. However, because we find that the district court did not statutorily enhance the sentences, we need not reach this issue.

34

sentenced the appellants according to the range established by the Guidelines. Juan Castro's offense level was set at 38, with a criminal history of I, resulting in a Guideline range of 235-293 months. The district court sentenced Castro to a 285-month term of incarceration. Abigail Puig's offense level was 38, with a criminal history of II, resulting in a Guideline range of 262-327 months. The district court sentenced her to a 292-month term of incarceration. The sentences imposed on both Juan Castro and Abigail Puig were well within the Guideline range, and were authorized by the "unenhanced" penalty provisions of sections 841 and 960, which provide for a term of imprisonment of anywhere from 10 years to life. *See* 21 U.S.C. § 841(b)(1)(A); 21 U.S.C. § 960(b)(1)(G). Hence, the district court did not use the statutory enhancement provisions to establish the sentences imposed on Juan Castro and Abigail Puig.[9]

The district court also sentenced Jose Puig to a term of imprisonment that was within the Guideline range. Jose Puig's offense level was 37, with a criminal history of IV, resulting in a Guideline range of 292-365 months. As with Juan Castro and Abigail Puig, the district court sentenced Jose Puig to a term of imprisonment within the Guideline range: 292 months. However,

---

[9] Abigail Puig also contends that enhancement of her sentence based on the state conviction violates the Fifth Amendment proscription against double jeopardy. Because we find that the district court did not enhance her sentence, we need not address this argument. We reject her implied contention (assuming, *arguendo* only, that it has been adequately raised and preserved) that double jeopardy prevents conduct for which she was convicted under state law from being part of her continuing criminal enterprise offense under 21 U.S.C. § 848(c). *See, e.g., United States v. Harrison*, 918 F.2d 469, 474 (5th Cir. 1990).

because Jose Puig's offense level may be reduced on remand, we discuss briefly his argument regarding enhancement. We note that, upon remand, the district court could conceivably calculate for Jose Puig a base offense level as low as 32, that applicable to conduct involving at least 1,000 kilograms but less than 3,000 kilograms of marihuana. Adding 3 offense levels for the uncontested finding that Puig was a supervisor or manager within the conspiracy would produce a total offense level as low as 35, resulting in a Guideline range of 235-293 months. Given the five-month disparity between the bottom of this possible Guideline range and the twenty-year mandatory minimum sentence for violating the substantive provisions of sections 841 and 960 after a prior felony drug conviction, we provide the following discussion for the benefit of the sentencing court.

The only conviction available to enhance Jose Puig's sentence is his July 16, 1990, conviction for possession of marihuana.[10] As set forth above, on June 15, 1990, Jose Puig was arrested when Texas police discovered fifty-five pounds of marihuana concealed in the car he was driving, and on July 16 he pleaded guilty in state

---

[10] The only convictions the court may rely upon for enhancement are those enumerated in the government's "Information of Prior Conviction," filed pursuant to 21 U.S.C. § 851. Section 851 provides in relevant part:

"No person who stands convicted of an offense . . . shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial . . . the United States attorney files an information with the court (and serves a copy of such information on the person or counsel for the person) stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1).

36

court to the charge of possession of more than five but less than fifty pounds of marihuana, a second degree felony, and was sentenced to fifteen years' imprisonment. Jose Puig was incarcerated at all times from June 15, 1990, until his conviction in the case *sub judice*.

For a sentencing court to enhance a defendant's sentence under section 841, the defendant must "commit [] such a violation" (involving the possession of more than 1,000 kilograms of marihuana with the intent to distribute it) "*after* a prior conviction for a felony drug offense has become final." 21 U.S.C. § 841(b)(1)(A) (emphasis added).[11] Similarly, section 960 requires enhancement for one who "commits such a violation" (involving the importation of more than 1,000 kilograms of marihuana) "after one or more prior [felony drug] convictions . . . have become final." 21 U.S.C. § 960(b)(1)(G).[12] A conviction becomes final when it is no longer

---

[11] The enhancement provision of section 841 provides that, when a person is convicted of knowingly or intentionally possessing with the intent to distribute 1,000 kilograms or more of marihuana,

> "such person shall be sentenced to a term of imprisonment which may not be less than 10 years or more than life . . . . If any person commits such a violation after a prior conviction for a felony drug offense has become final, such person shall be sentenced to a term of imprisonment which may not be less than 20 years and not more than life imprisonment . . . ." 21 U.S.C. § 841(b)(1)(A).

[12] The enhancement provision of section 960 is similar to that of section 841. Section 960(b)(1) provides that when a person is convicted of knowingly or intentionally importing 1,000 kilograms or more of marihuana

> "the person committing such violation shall be sentenced to a term of imprisonment of not less than 10 years and not more than life . . . . If any person

37

subject to examination on direct appeal. *See United States v. Morales*, 854 F.2d 65 (5th Cir. 1988).

Jose Puig contends that because he was incarcerated from the time of his June 15, 1990, arrest onward, and was thus unable to commit an offense after his July 16, 1990, Texas conviction became final, this state conviction may not be used to enhance his sentence. The government argues that because Puig was part of a conspiracy which continued after his July 16, 1990, Texas conviction became final, and because he failed to affirmatively withdraw from the conspiracy, Jose Puig continued to violate the provisions of sections 841 and 960 while incarcerated pursuant to his July 16, 1990, conviction. While we need not specifically decide this issue, we note that the purpose of the recidivist provisions of these statutes is the deterrence of future criminal conduct and that it seems doubtful any deterrent purpose would be served by enhancing Jose Puig's sentence without evidence that he engaged in some conduct in furtherance of the conspiracy while incarcerated after his state conviction became final.[13] *Cf. United*

---

commits such a violation after one or more prior convictions for an offense punishable under this subsection, or for a felony under any other provision of this subchapter or subchapter I of this chapter or other law of a State, the United States, or a foreign country relating to narcotic drugs, marihuana, or depressant or stimulant substances, have become final, such person shall be sentenced to a term of imprisonment of not less than 20 years and not more than life imprisonment . . . ." 21 U.S.C. 960(b)(1).

[13]    At the sentencing hearing, the government did not tender any evidence of Puig's post-incarceration conduct, although it asserted that:

"We have evidence we're prepared to go forward with to

*States v. Rosenthal*, 793 F.2d 1214, 1244 (11th Cir. 1986) (holding that defendant's incarceration did not constitute withdrawal when evidence showed that he was actively engaged in drug trafficking operation while in prison), *cert. denied*, 107 S.Ct. 1377 (1987).

V.    Employment of a Minor to Assist in Drug Trafficking

Juan Castro appeals his conviction under 21 U.S.C. § 861(a)(1), which makes it an offense for any person who is "at least eighteen years of age to knowingly and intentionally . . . employ . . . a person under eighteen years of age to violate any provision of" the Controlled Substances Act.  Juan Castro was convicted for hiring Irma Gonzalez to transport and import into the United States sixty-six pounds of marihuana.  Juan Castro contends that the government failed to prove (1) that he was over eighteen years of age, and (2) that Irma Gonzalez was under eighteen years of age.

Viewing the evidence in the light most favorable to the verdict, Castro's contention is without merit.  Gonzalez was arrested while transporting a load of marihuana for Castro in November of 1988.  The government introduced, without objection, the testimony of Border Patrol Agent Mario Rebolledo and the

---

the effect that after [he] . . . pled guilty to [the] state offense and was transferred to the Texas Department of Corrections that Jose Antonio Puig-Infante continued actively in the conspiracy and did a number of acts which indicated that he had not withdrawn from the conspiracy even after his arrest."

Although on remand the government will have an opportunity to substantiate these unsworn assertions of its counsel, without some substantiation they should not be considered by the district court in making its factual findings. *See United States v. Alfaro*, 919 F.2d 962, 966 (5th Cir. 1990).

39

testimony of Officer Alberto Juarez of the Webb County Sheriff's Department that Gonzalez was seventeen years old at the time of her arrest. Moreover, Valles testified that she thought Gonzalez was sixteen years old at the time she was driving for Juan Castro. With regard to Juan Castro's age, the government introduced into evidence an Internal Revenue Service form which listed Juan Castro's birthdate as September 14, 1955. Given this undisputed evidence, a rational jury could have easily concluded that Irma was under, and Juan Castro over, eighteen years of age.

## VI. Importation of Marihuana

Juan Castro also challenges his conviction for aiding and abetting the importation of 99.8 kilograms of marihuana under 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. To prove an importation offense, "the government need only prove that the defendant knowingly played a role in transporting contraband from a foreign country into the United States." *United States v. Gibson*, 963 F.2d 708, 710 (5th Cir. 1992) (multiple citations omitted). To establish that Juan Castro aided and abetted the importation, the government must show that he "'willfully associated himself in some way with the criminal venture and willfully participated in it as he would in something he wished to bring about.'" *United States v. Stanley*, 765 F.2d 1224, 1242 (5th Cir. 1985) (quoting *United States v. Phillips*, 664 F.2d 971, 1010 (5th Cir. 1981)).

Juan Castro's conviction arises out of the December 10, 1988, seizure of a marihuana load imported into the United States by Bruce Coggins, a driver for the organization and a confidential informant for the DEA. Coggins testified that while meeting with

40

Juan Castro at a restaurant in Cielo De Flores, Mexico, Juan Castro instructed him that the load was not ready but that he should return at a later date to pick up the marihuana. A few days later, on December 9, 1988, Coggins returned to the restaurant in Cielo De Flores. When he arrived, he was met by several persons who took him to another location and loaded ninety-nine kilograms of marihuana in the trunk of his car. He drove the load of marihuana across the border and parked it at an apartment complex in Laredo, where it was seized by law enforcement authorities. After he dropped off the car, Coggins called Alfredo Castro, Juan Castro's nephew, who then accompanied Coggins back to the apartment complex to pick up the car. When Alfredo learned that the car was missing, he called Juan Castro and Araceli Castro and told them what had happened.

From this evidence, Juan Castro's substantial connection to the load imported by Coggins could properly be inferred. A rational jury could easily have found that Juan Castro "willfully associated himself in some way with the [Coggins' importation of marihuana] and willfully participated in it as he would in something he wished to bring about." Hence, the evidence was sufficient to support Juan Castro's conviction for aiding and abetting the importation of 99.8 kilograms of marihuana.

VII. Explanatory Parentheticals in Transcripts

Perla De Los Santos, Juan Castro, Jose Puig, and Abigail Puig complain that the district court committed reversible error by allowing into evidence transcripts with parentheticals containing the transcriber's interpretation of certain "code words." The

41

government contends that the transcripts provided to the jury were redacted to eliminate the explanatory parentheticals pursuant to the instructions of the district court at trial.

At trial, the government offered into evidence recordings of the original telephone conversations between Valles and various members of the conspiracy. At the pretrial conference, counsel for Abigail Puig and Araceli Castro objected to admission of the transcripts on the grounds that "the agent's analysis is contained in the transcript" and that the transcriber had, throughout the documents, defined several code words by placing the word "marihuana" within parentheses. The district court responded that the transcripts were not evidence and were only to be used to assist the jury in its analysis of the tape recordings. The court also noted that the defense had the right to "proffer what you believe to be a different meaning for the particular [']code word['] if you think it has a different meaning."

During the portion of the testimony of Valles when the government offered the tape recordings into evidence, counsel for Araceli Castro repeated her pretrial objection and argued that the interpreter of the tapes should be subject to cross-examination. Overruling her objection, the court explained that the defense could question Valles about the translation in the transcript. After further discussion, defense counsel made clear that the only objection to the transcripts was the inclusion of the explanatory term "marihuana." Sustaining this objection, the court ordered the government to eliminate from the transcripts to be provided to the jury the parentheticals containing the word "marihuana." The

42

record reflects that the government *in fact* removed the parentheticals from the copies of the transcripts submitted to the jury, and nothing presented by the appellants in this appeal indicates otherwise. Hence, the appellants have no factual basis for their appeal in this respect.[14]

VIII. Neutral Judge

Finally, Araceli Castro complains that the district judge exceeded his role as a neutral magistrate during the direct examination of Bruce Coggins. After Coggins was asked to identify a photograph of the bundles of marihuana that were in the trunk of his car, the transcript reflects the following exchange:

"Q: Does that show them after they have been unloaded, sir?

A: Yes, sir.

Q: And does that accurately represent what they looked like after they were unloaded?

THE COURT: Yes, sir, it does.

MR. HARRIS (prosecutor): If your Honor pleases, at this time I would offer into evidence Government's Exhibit 5 and Government's Exhibit 211-A.

THE COURT: Any objection?

MR. MARTINEZ (counsel for Abigail Puig): No objection."

Both the wording and the context of the response to the government's question suggests that Coggins, and not the court, answered the question, and that the attribution to the court was a

---

[14] Moreover, even assuming *arguendo* that not *all* of the objectionable parentheticals were removed, given the overall state of the evidence and the fact that Valles was available for cross-examination on the subject, any error arising out of any failure to remove all the parentheticals was harmless in this case.

43

transcript error.  This interpretation is reinforced by the fact that no objection was made by defense counsel.  This probability notwithstanding, because no objection was made, we review the matter for plain error.

Plain error occurs when the error is so obvious and substantial that failure to notice and correct it would affect the fairness, integrity, or public reputation of judicial proceedings and would result in manifest injustice.  *Carreon*, 11 F.3d at 1240. Here, no such error has been demonstrated.  Even if the statement at issue was not the result of a transcript error, the question asked by the government was asked for the purpose of laying the evidentiary predicate for the admission of the photograph of the marihuana and was actually repetitive of the prior question.  Thus, any effect on the defendant's case was negligible.  Additionally, any prejudicial effect of the statement was mitigated by the court's instructions, which stated explicitly that the judge's statements were not evidence.  *United States v. Gonzalez*, 700 F.2d 196, 198 (5th Cir. 1983).

## Conclusion

We affirm the convictions and sentences of Araceli Castro, Perla De Los Santos, and Juan Castro.  As to Abigail Puig, we reverse her conviction as to count seventeen (17), and affirm her conviction on all other counts; because of our reversal as to count 17, her sentences on all counts are vacated and the cause as to her is remanded for resentencing on all the remaining counts of conviction.  As to Jose Puig, we reverse his conviction as to count seventeen (17), and affirm his conviction on all other counts; his

44

sentences on all counts are vacated and the cause as to him is remanded for resentencing consistent herewith on the remaining counts of conviction.

As to Araceli Castro, Perla De Los Santos, and Juan Castro: AFFIRMED.

As to Abigail Puig: AFFIRMED in part; REVERSED in part; REMANDED for resentencing.

As to Jose Puig:  AFFIRMED in part; REVERSED in part; REMANDED for resentencing.