**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 95-50639
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellant,


VERSUS

ANTHONY J. COLEMAN,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Western District of Texas
(W-94-CR-97-6)
_____


August 9, 1996

Before KING, SMITH, and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]


Anthony Coleman appeals a sentence imposed for armed bank robbery. Finding no reversible error, we affirm.


I.

In August 1994, Coleman and eleven associates formed a plan to

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

rob the Normangee State Bank in Normangee, Texas. He was familiar with both Normangee and the bank, and he helped to develop the plan by providing information about the bank.

On the morning of the robbery, the group drove from Houston to Normangee to execute their scheme. They took three cars: an Explorer, an Escort, and an Accord. They stopped at a cemetery outside Normangee to formulate final plans. Those who planned to enter the bank during the course of the robbery donned gloves, ski masks, bandannas, and bullet proof vests; many were also heavily armed. Coleman was not armed, as he was not to accompany the group to the bank.

Pursuant to the plan, Coleman and one associate, James Hoskins, remained at the cemetery in the Explorer, while the others went to the bank in the other vehicles around 8:15 a.m. When they discovered that the bank was not yet open, they returned to the cemetery. Although Coleman and Hoskins had left the cemetery to avoid suspicion, they soon returned.

After some discussion, the entire group went back into town, but the bank was still closed. They again returned to the cemetery to regroup. Frustrated that the bank was not yet open, they decided to buy beer at a convenience store. One member of the group, Steven Thomas, proposed to rob the convenience store and kill everyone inside so there would be no witnesses. When no one would help him rob the store, however, they returned to the cemetery.

2

The entire group again decided to drive to the bank. By this time, the bank was open, but Thomas entered the bank prematurely. This created some confusion: Five members of the group followed Thomas into the bank a few minutes later, but Coleman and Hoskins, who were in the Explorer, left the scene along with those in the Escort. When Thomas and his five associates exited the bank after completing the robbery, only the Accord remained. They were forced to pile into the Accord, two of them riding in the trunk.

As the group in the Accord returned to the cemetery, they saw another car enter the cemetery ahead of them. Recognizing that they needed another vehicle, one member of the group requisitioned the car by killing its driver, Ruby Parker. Now equipped with two vehicles, they left Normangee and were arrested shortly thereafter.

Coleman pleaded guilty to armed robbery. Based on Parker's murder, the district court calculated the applicable sentencing range at 360 months to life and sentenced Coleman to 300 months, the statutory maximum for bank robbery.

II.

Coleman argues that the district court erred by taking into account Parker's murder when calculating his sentence.[1] The

---

[1] Coleman pleaded guilty to bank robbery, not homicide. The guidelines provision for robbery, however, contains a cross-reference to the homicide provision. U.S.S.G. § 2B3.1(c)(1). The cross-reference requires that the court apply the guidelines provisions governing homicide rather than robbery "[i]f a victim was killed under circumstances that would constitute murder under 18

(continued...)

guidelines provide that when a defendant engages in a jointly undertaken criminal activity, his sentence should be calculated based on "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Coleman urges us that the district court erred for three reasons: (1) Parker's murder was not reasonably foreseeable; (2) the murder was not within the scope of the jointly-undertaken criminal activity, and (3) he withdrew from the conspiracy before the murder occurred.

The district court made factual findings that Parker's murder was a reasonably foreseeable result of the jointly undertaken criminal activity and that Coleman did not withdraw before the murder occurred. We must affirm these findings unless they are clearly erroneous. *United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir.) (stating that findings of fact made in determining relevant conduct will be affirmed unless clearly erroneous), *cert. denied*, 115 S. Ct. 180 (1994). A factual finding that "is plausible in light of the record read as a whole" is not clearly erroneous. *Id.*

A.

Coleman argues that Parker's murder was not a reasonably

_____

[1](...continued)
U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States." *Id.*

4

foreseeable act in furtherance of the bank robbery.[2]  We disagree.

Coleman's associates were heavily armed when they set out to rob

the bank.  Before the group entered the bank, various members

expressed a willingness to use their guns if anything went wrong.

One even proposed robbing a convenience store and killing the

occupants.   In light of these facts, we do not believe the

district court erred in finding Parker's murder to be reasonably

foreseeable.

## B.

Coleman also asserts that the district court erred in finding

the jointly undertaken criminal activity to be bank robbery.  He

urges that he only jointly undertook to provide the group with

information about the bank and to travel to Normangee on the day of

---

[2] The guidelines commentary provides two relevant illustrations:

[T]wo defendants agree to commit a robbery and, during the course of
that robbery, the first defendant assaults and injures a victim.
The second defendant is accountable for the assault and injury to
the victim (even if the second defendant had not agreed to the
assault and had cautioned the first defendant to be careful not to
hurt anyone) because the assaultive conduct was in furtherance of
the jointly undertaken criminal activity (the robbery) and was
reasonably foreseeable in connection with that criminal activity
(given the nature of the offense).

. . .

Defendant C is the getaway driver in an armed bank robbery in which
$15,000 is taken and a teller is assaulted and injured. . . .
Defendant C is accountable for the injury to the teller under
subsection (a)(1)(B) because the assault on the teller was in
furtherance of the jointly undertaken criminal activity (the
robbery) and was reasonably foreseeable in connection with that
criminal activity (given the nature of the offense).

§ 1B1.3, comment. (n.2).

5

the robbery; he maintains that he did not jointly undertake bank robbery.

We are not persuaded. The guidelines define "jointly undertaken criminal activity" to include "a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy." U.S.S.G. § 1B1.3, comment. (n.2). The guidelines further note that in determining the scope of the jointly-undertaken criminal activity, a court should consider the "objectives embraced by the defendant's agreement." *Id*.

In this case, the jointly undertaken activity was bank robbery. Coleman's role may have been limited to providing information and traveling to Normangee on the day of the robbery, but he did so with the obvious purpose of helping the entire group to rob the bank.

## C.

Coleman also maintains that he should not be held accountable for Parker's murder because he withdrew from the conspiracy before the murder occurred. The district court rejected this argument on the ground that Coleman did not perform any affirmative act demonstrating his withdrawal. Coleman concedes that some affirmative act was necessary but contends that he performed such an act when he accepted Hoskins's invitation to return to Houston with

anyone who did not wish to participate in the robbery.

The district court's finding was not clearly erroneous. The only evidence Coleman offered to support his claim of withdrawal was Hoskins's testimony at sentencing that before the group left the cemetery, he extended an invitation to return to Houston with anyone who did not wish to participate in the robbery, and Coleman accepted the invitation. The district court gave no credence to Hoskins's testimony, which directly conflicted with the accounts provided by Hoskins's codefendants. Furthermore, after Hoskins and Coleman purportedly withdrew at the cemetery, they accompanied the group to the bank.

Credibility determinations are peculiarly within the province of the district court. *Kendall v. Block*, 821 F.2d 1142, 1146 (5th Cir. 1987). We therefore conclude that the district court did not clearly err in finding that Coleman did not withdraw from the robbery before the murder.

III.

Coleman contends that the district court erred by relying upon testimony from his codefendants' trial at sentencing without giving him notice and an opportunity to respond. We conclude that Coleman did receive adequate notice and opportunity to respond, because the testimony appeared in his presentence report ("PSR").

We have consistently held that a defendant is entitled to

7

notice of any evidence that will be used against him at sentencing, but only when the evidence does not appear in the PSR.[3]  The fact that evidence appears in the PSR is enough to place a defendant on notice that the district court may rely on that evidence in sentencing, and a defendant has an opportunity to respond to any such evidence.  *See* FED. R. CRIM. P. 32(b)(6)(B), (c)(1) (providing means for defendant to challenge information in PSR).  There is no need for the court to provide additional notice simply because the evidence consists of codefendants' testimony.

IV.

Coleman maintains that the district court erred by applying a three-level reduction for acceptance of responsibility to his base offense level rather than to the statutory maximum sentence.  The court first calculated a base offense level of 43.  It then granted the government's § 3E1.1 motion for a three-level reduction for acceptance of responsibility.  *See* U.S.S.G. § 3E1.1(a).  This left Coleman with an offense level of 40 and a corresponding sentencing range of 360 months to life.  The statutory maximum sentence for bank robbery, however, is 300 months, 18 U.S.C. § 2113.  Because

---

[3] *See, e.g.*, *United States v. Landry*, 903 F.2d 334, 340 (5th Cir. 1990) ("[I]n the event that the district court intends to rely on such [matters outside the PSR] in making an upward adjustment, the district court must provide defense counsel with an opportunity to address the court on this issue."); *United States v. Otero*, 868 F.2d 1412, 1415 (5th Cir. 1989) ("If, however, the court intends to rely on any such additional factor [not in the PSR] to make an upward adjustment of the sentence, defense counsel must be given an opportunity to address the court on the issue.").

his sentencing range exceeded the statutory maximum, Coleman did not receive any benefit from the § 3E1.1 reduction.

Coleman failed to raise this issue at sentencing. As a result, we may not vacate his sentence unless the sentencing court committed plain error. *United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir. 1994) (en banc) (citing *United States v. Olano*, 507 U.S. 725, 731-37 (1993)), *cert. denied*, 115 S. Ct. 1266 (1995).

It was not plain error for the district court to apply the § 3E1.1 departure to Coleman's base offense level rather than to the statutory maximum. He fails to point to any authority requiring that such departures be applied in the manner he proposes. In fact, the guidelines appear to require the opposite result. Section 1B1.1 instructs sentencing courts first to determine the appropriate base offense level, then to apply any adjustment for acceptance of responsibility, and finally to consider any statutory maximum.[4]

---

[4] Section 1B1.1 instructs courts to calculate a sentence in the following manner:

> (b)  Determine the base offense level and apply any appropriate specific offense characteristics contained in the particular guideline in Chapter Two in the order listed.
>
> . . . .
>
> (e)  Apply the adjustment as appropriate for the defendants's acceptance of responsibility from Part E of Chapter Three.
>
> . . . .
>
> (h)  For the particular guideline range, determine from Parts

(continued...)

9

The judgment of sentence is AFFIRMED.

---

[4](...continued)
> B through G of Chapter Five the sentencing requirements
> and options related to probation, imprisonment,
> supervision conditions, fines, and restitution.

U.S.S.G. § 1B1.1; *see also United States v. Rodriguez*, 64 F.3d 638, 641 (11th Cir. 1995) (noting that guidelines require § 3E1.1 reductions to base offense level rather than to the statutory maximum sentence).

This case involves a different issue from that decided by *Rodriguez*. *Rodriguez* held that a district court may depart downward from a statutory maximum when the maximum nullifies any benefit the defendant would receive from a § 3E1.1 departure, though such a departure is completely discretionary. *Id.* at 642. In contrast, Coleman argues that the district court simply misapplied the guidelines as a mater of law by applying the § 3E1.1 departure before considering the statutory maximum, an argument *Rodriguez* rejected. *Id.* at 641. Coleman never urged the district court to make a discretionary departure to compensate him for the fact the statutory maximum deprived him of receiving any benefit from the § 3E1.1 departure. Nor did the district court--like the sentencing court in *Rodriguez*--state that it had no discretion to make such a departure. *Id.* at 641 n.3.